## DECATUR BANK *v.* ST. LOUIS BANK.

1. A bank at Decatur, Illinois, accredited B. with a bank at St. Louis, Missouri, saying that " his drafts against shipments of *cattle* to the extent of $10,000 are hereby guaranteed." *Held,* that *hogs* were included within the term cattle, and that B.'s drafts against shipments of hogs not having been paid, the Bank of Decatur was responsible on its letter of credit.

2. Though there may be plain error in a charge, yet if the record present to this court the whole case, and it be plain from such whole case that if the court had charged rightly the result of the trial would have been the same as it was, this court will not reverse.

ERROR to the Circuit Court for the Southern District of Illinois.

In the autumn and winter of 1869, P. E. Frederick—who, according to his own account, was at that time " engaged in buying and shipping *stock* in St. Louis "—intending to purchase cattle there and ship them to a business connection of his in Chicago, named J. S. Talmadge, who was to receive and sell them, and honor Frederick's drafts given in payment for the same—applied to the First National Bank of Decatur, Illinois, for a letter of credit on some bank in St. Louis. The bank at Decatur accordingly gave him a letter on its correspondent, the Home Savings Bank of St. Louis.

The letter was in these words:

FIRST NATIONAL BANK,<br>
DECATUR, ILL., September 13th, 1869.

H. C. PIERCE, ESQ.,
        Cashier, St. Louis, Mo.

SIR: We beg herewith to accredit with you P. E. Frederick, Esq , whose drafts on shipments of *cattle* to J. S. Talmadge,

Chicago, are herewith guaranteed to the amount of ten thousand dollars for thirty days from date.

Yours respectfully,<br>J. H. LIVINGSTON.

Pierce answered thus:

HOME SAVINGS BANK,<br>ST. LOUIS, September 18th, 1869.

J. H. LIVINGSTON, ESQ.,
Cashier.

DEAR SIR: Mr. Frederick has to-day presented your letter of credit for $10,000 of 13th at thirty days.  Permit me to inquire, in case his drafts for $10,000 or less on Talmadge are paid, does your letter mean that we may take his draft again up to same amount, and so on for your limit, thirty days?  That is to say, do you guarantee us for thirty days on Frederick's drafts on Talmadge for $10,000?

Yours respectfully,<br>H. C. PIERCE,<br>Cashier.

And on the 21st of September, 1869, the cashier of the Decatur bank replied as follows, viz.:

FIRST NATIONAL BANK,<br>DECATUR, ILL., September 21st, 1869.

H. C. PIERCE, ESQ.,
Cashier, St. Louis, Mo.

DEAR SIR: Your favor of the 18th is received.  Yes, we guarantee you on Frederick's drafts on Talmadge for $10,000 for thirty days from September 13th, 1869.

Yours respectfully,<br>J. H. LIVINGSTON.

The thirty days limited in the last letter being on the eve of expiration, the Illinois bank renewed and extended its guarantee by the following communication, viz.:

FIRST NATIONAL BANK,<br>DECATUR, ILL., October 20th, 1869.

H. C. PIERCE, ESQ.,
Cashier, St. Louis, Mo.

DEAR SIR: *The guarantee* given for Mr. Frederick, please consider extended for thirty days from expiration.

Yours, &c.,<br>J. H. LIVINGSTON.

And again, when the limit fixed by the last letter had expired:

FIRST NATIONAL BANK,
DECATUR, ILL., November 22d, 1869.

H. C. PIERCE, ESQ.,
Cashier, St. Louis, Mo.

SIR : *The letter of credit* given you for Mr. Frederick is hereby extended for thirty days from expiration last date.

Respectfully,
J. H. LIVINGSTON,
Cashier.

Accredited with the letters thus given, Frederick went to St. Louis, and—having just previously to the 10th of December, 1869 (that is to say, within the term embraced by the letter of November the 22d), shipped *hogs* to his correspondent at Chicago, Talmadge—drew drafts to the amount of $8000 against them. Talmadge failed before the drafts came due; and the bank at St. Louis now came upon the bank at Decatur for payment under the guarantee. This latter bank set up that its guarantee was of drafts drawn against shipments of *cattle*, and that the drafts sued on were against shipments of hogs, and that these were not cattle, which term, as understood in the transaction, was confined to animals of the bovine species. The Decatur bank did not allege that any injury had accrued to it by the fact that the shipment was of hogs, which would not have accrued if the shipment had been of animals of the bovine species; or that there was any want of good faith on the part of the St. Louis bank or of Frederick in the transaction.

There was also a plea:

" And for a further plea, &c , the defendant says *actio non*, because, it says, that it is not true that the defendant, by its cashier, executed the alleged letters of credit, or written guarantee, or any of the same in said counts mentioned and described; and this the defendant prays may be inquired of by the country, &c."

But this plea was apparently abandoned.

The court below charged " that the contract of guarantee was contained *in the letter of J. H. Livingston, dated September*

21*st*, 1869, and the extension thereof, and that the defendant would be bound to pay drafts drawn by Frederick upon Talmadge within the limits of the said letter and the extensions thereof, as to time and amount, *no matter whether such drafts were drawn upon shipments of cattle or not.*" To this instruction the defendant excepted, and verdict and judgment having been given for the plaintiff the defendant brought the case here. The bill of exceptions set out all the evidence in the case.

*Mr. J. B. Hawley, for the plaintiff in error:*

It is obvious that the court erred in assuming that the letter of September 21st made the credit. That letter plainly refers to the original letter—the letter of the 13th—and explains a doubt which was in the mind of the cashier of the St. Louis bank as to whether, by its terms, the guarantee was a continuing guarantee; but the new letter in no way abandons the old one. Now, that letter shows that the Decatur bank regarded it as important that the drafts to be drawn by Frederick should be drawn upon shipments of *cattle.* Hogs do not, in the parlance of stockdealers or of banks familiar with the trade of that sort of persons, as both the banks here were, or in fact in any common parlance of anybody, come within the term "cattle." It is of no use to cite books of natural history or of lexicography, or even to cite statutes and decisions to show that in certain senses hogs may be included within the term "cattle." The question is, what did the parties here before the court mean? And no one familiar with the language of the region where the transactions occurred, or of the country generally, will suppose that when the parties spoke of cattle they meant hogs, any more than that they meant deer.

The Decatur bank having consented to be bound only in case cattle were shipped, no liability attaches to it if they were not shipped. Talmadge may have had great facilities for dealing in "cattle," and none at all in dealing in hogs.

Again: There is nothing to be found in the National Currency Act, or in any other law, giving authority to Na-

tional banks to issue letters of credit. They have power to exercise "all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; by obtaining, issuing, and circulating notes according to the provisions of this act."*

Among these powers the power to issue letters of credit is not found, neither is it incidental to any of the powers granted.

*Mr. F. W. Jones, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

The basis of this suit is the letter of credit of 13th September, 1869. The subsequent correspondence, on any rational interpretation of it, did not have the effect to change the terms of this the original letter, nor was it intended to do so except in two particulars, which are not the subject of controversy.

The defence now made, technical though it be, is sufficient to defeat the action if the condition of the guarantee was not observed, and this fact renders necessary a construction of the instrument.

Like all other contracts it must receive the construction which is most probable and natural under the circumstances, so as to attain the object which the parties to it had in contemplation in making it. Frederick was engaged in buying and shipping stock in St. Louis during the fall and winter of 1869, and the presumption is, in the absence of any evidence on the point, that he resided in Decatur, where the plaintiff in error had its place of business. At any rate, he was unknown in St. Louis, without either money or credit, and, as he could not carry on his business without money, it was necessary that he should be accredited to some re-

* Act of June 3d, 1864, § 11, 12 Stat. at Large, 668.

sponsible banking house in that city.   This was done through
the letter of credit of 13th September.   The bank to which
this letter was addressed doubtless thought its correspond-
ent trusted in some degree to the pecuniary responsibility
of Frederick, but it had no right to suppose that the letter
of credit was given solely on this account.   On the contrary,
the letter is based on the idea that shipments of stock would
protect the drafts.   If Frederick was responsible, still the
Decatur bank did not trust to this alone, but relied on the
security which was to accompany the drafts.   This it had a
right to do, and its conduct was very natural under the cir-
cumstances.   Indeed, the business in which Frederick was
engaged is usually conducted in this manner.   The Decatur
bank doubtless believed, and acted on the belief, that the
stock would sell for enough to pay the drafts, and if it did
not, the loss would be inconsiderable and such as Frederick
could readily meet.

It now seeks to escape liability, not on the ground that
stock sufficient to secure the drafts was not shipped, but that
it was a different sort of stock from that named in its letter.
It is fair to presume that an investment in hogs yielded as
good a return as an investment in cattle, and if the con-
signee in Chicago had not failed, that no trouble would have
arisen.   As this consignee, named by it, and with whom the
St. Louis bank had no concern, did fail, it seeks to throw
the loss on the St. Louis bank because it interpreted the
letter to embrace shipments of hogs as well as neat cattle.

The question then arises, was this interpretation correct?

That stock of some kind formed part of the guarantee is
quite plain, but is the word " cattle " in this connection to
be confined to neat cattle alone, that is, cattle of the bovine
genus?   It is often so applied, but it is " also a collective
name for domestic quadrupeds generally, including not only
the bovine tribe, but horses, asses, mules, sheep, goats, and
swine."*   In its limited sense it is used to designate the dif-
ferent varieties of horned animals, but it is also frequently

---

* Worcester's Dictionary, in verbo, "Cattle."

used with a broader signification as embracing animals in general which serve as food for man. In England, even in a criminal case, where there is a greater strictness of construction than in a civil controversy, pigs were held to be included within the words "any cattle."* And in other cases in that country involving life and liberty the word has been construed so as to embrace animals not used for food.†

Did the Decatur bank use the word in its narrow and restricted meaning or in its more enlarged and general sense? In other words, did it intend to restrict Frederick to the dealing in horned animals alone, and so confine the defendant in error to drafts based on this kind of stock? There was no apparent motive for doing so. Clearly, security was the object to be attained, and this was better attained by leaving Frederick unrestricted in the choice of animals to send forward to market, provided they were of the kind generally used for food. It is well known that the market varies at the Chicago cattle-yards. At certain times hogs have a readier sale and bring better prices than other kinds of stock, and at other times horned animals alone command the attention of buyers. Every prudent dealer in stock informs himself of the state of the market before purchasing, and the means of doing this are greatly multiplied in later years.

That Frederick pursued this course, and bought and sold according to the indications of the Chicago market, would seem clear from the evidence, for he says he was engaged in buying and shipping *stock* in St. Louis during the fall and winter of 1869. If his operations, except in the single instance on which the drafts in suit are based, were confined to horned stock, why did he not say so? If true, it would have strengthened the defence, because it would have shown that all the dealings between Frederick and the defendant in error, with a single exception, were based on shipments of stock of the bovine genus. These dealings were continued

---

* Rex *v.* Chapple, Russell & Ryan, Crown Cases, 77.

† Rex *v.* Whitney, Moody's Crown Cases, 3; Paty's Case, 2 W. Blackstone, 721; Rex *v.* Mott, 2 East, Pleas of the Crown, 1074–6.

through a period of three months by the renewals of the guarantee, and could not have been infrequent. It would seem, therefore, that the parties in St. Louis dealt with each other on the understanding that the guarantee embraced the different kinds of stock which are used for food, and usually sent for that purpose to the Chicago market.

They had the right to give this construction to it, and there is nothing in the evidence tending to show that the plaintiff in error understood it differently, except that the word " cattle," as often used, does not include hogs. But it would be a narrow rule to hold that this word was used in its restricted sense, in the absence of any evidence, other than inferential, on the subject. Especially is this so when the word is susceptible of a different meaning, and important transactions have been based on the idea that it was employed in its enlarged and not in its restricted sense.

This construction of the letter of credit disposes of the case and affirms the judgment.

It is true, the judge of the Circuit Court instructed the jury that the letter of September 21st, which leaves out the terms " on shipments of cattle," constituted the contract of guarantee between the plaintiff and defendant, but the result would have been the same if he had charged the jury, as we are of the opinion that he should have done, that the rights of the parties were to be determined by the terms of the original letter of credit of the 13th September.

In either aspect of the case the judgment must have been for the plaintiff below, and to warrant the reversal of a judgment there must be not only error found in the record, but the error must be such as may have worked injury to the party complaining.*

The bill of exceptions contains all the evidence in the case, and though the jury may have found their verdict on a wrong theory of the case, yet as the court can see that the verdict was correct, the plaintiff in error is not harmed by the misdirection of the judge. The result is right, although the manner of reaching it may have been wrong.

* Brobst *v.* Brock, 10 Wallace, 519.

It was urged at the bar that National banks are not authorized to issue letters of credit, and if so, that the action cannot be sustained. But the record does not raise the question, and it cannot, therefore, be considered. It is true a plea was interposed which was doubtless meant to raise it, on which, issue to the country was tendered, but for aught that appears it was abandoned.

No evidence was offered under it, but if this were not necessary the attention of the court at least should have been called to it, and proper instructions asked. If refused, error could have been assigned, and the point would then have been properly before the court for decision.

Nothing of the kind was done, and it is too late to raise the question *now.*

JUDGMENT AFFIRMED.