## DE SOUSA et al. v. CROCKER FIRST NAT. BANK OF SAN FRANCISCO (HIND et al., Interveners).

District Court, N. D. California, S. D.
December 16, 1927.

No. 16713.

1. **Banks and banking** ⟨191—Bank's statement of grounds for refusing to pay draft drawn on letter of credit waives all other objections.

Statement by bank of grounds for refusal to pay draft drawn on letter of credit waives all other objections.

2. **Banks and banking** ⟨191—Construction of letter of credit as to conditions precedent to payment of drafts is governed by rules applicable to ordinary commercial contracts.

In construing a letter of credit to determine what are the material conditions precedent to acceptance of drafts, the rules governing the construction and interpretation of ordinary commercial contracts are applicable.

3. **Banks and banking** ⟨191—Literal compliance with terms of letter of credit as to documents accompanying draft is not required to authorize payment of drafts thereunder.

Literal, word for word, compliance with the terms of a letter of credit, as to documents

accompanying a draft, is not required, to legally authorize and require payment of drafts thereunder, but substantial compliance in all essentials is sufficient, though bank practice may require literal compliance.

**4. Banks and banking ⟨⟩191—Bank is not justified in rejecting draft under letter of credit, if all accompanying documents, read together, answer requirements of letter.**

Where several documents to accompanying drafts are called for by letter of credit, if all, read together, show compliance with the call, the bank is not justified in rejecting a draft.

**5. Banks and banking ⟨⟩191—Documents accompanying draft calling for "fine sugar" held sufficient to answer the call in letter of credit for "fine granulated sugar."**

The phrase "fine sugar," used in a consular invoice accompanying drafts, which by common knowledge and in the trade means "fine granulated sugar," *held* sufficient to answer the call in a letter of credit for "fine granulated sugar."

**6. Banks and banking ⟨⟩191—Measure of damages for unjustified refusal of bank to pay draft against letter of credit for price of shipment of sugar, held difference between net amount from sale and amount of draft.**

Where a bank, without justification, refused to accept and pay a draft drawn against a letter of credit for the price of a shipment of sugar, which was later sold by shipper, its measure of damages recoverable from the bank *held* to be the difference between the net amount realized from the sale and the amount of the draft.

**7. Parties ⟨⟩47—Intervener cannot enlarge the issues.**

Intervener, who joins plaintiff or defendant in resisting claims of other side, is not entitled to enlarge the issues.

At law. Action by E. V. M. R. De Sousa and Leung Yan Po, partners as De Sousa & Co. against the Crocker First National Bank of San Francisco, substituted for the Crocker National Bank of San Francisco, with George U. Hind and James Rolph, Jr., partners as Hind, Rolph & Co., interveners. Judgment for plaintiffs.

T. T. C. Gregory and C. J. Goodell, both of San Francisco, Cal., and Frank V. Cornish, of Berkeley, Cal., for complainants.

Morrison, Hohfeld, Foerster, Shuman & Clark, and J. F. Shuman, all of San Francisco, Cal., for respondent.

Ira S. Lillick, and Theodore M. Levy, both of San Francisco, Cal., for interveners.

KERRIGAN, District Judge. This is an action for damages, brought by the sellers of certain sugar against the Crocker First National Bank, as successor to the liabilities of the Crocker National Bank of San Francisco, on account of the refusal of the bank to

pay certain drafts. The facts are briefly these:

On May 13, 1920, plaintiffs, De Sousa & Co., sellers, and Hind, Rolph & Co., buyers (interveners in this action), entered into a contract of sale for 500 tons white Java granulated sugar, polarization 97/98 deg., at 20½ cents a pound, c. i. f. San Francisco. On May 20, 1920, in accordance with this contract, the buyers procured from the Crocker National Bank a letter of credit for $208,000 in favor of De Sousa & Co. In this letter of credit the bank agreed that it would accept on presentation, and pay in 60 days, drafts not to exceed $208,000, if accompanied by "full sets of invoices, consular invoices, marine and war risk insurance certificates, surveyor's certificate of quality, weight certificate, and negotiable ocean bills of lading, made out to order of the shippers, and indorsed in blank, against shipment of "500 tons (2,000 pounds each) net, white Java refined granulated sugar, 97/98 deg. polarization, at 20½ cents per pound, gross shipped weight, c. i. f. San Francisco; shipment from Hong Kong during May/June, 1920."

This letter of credit was sent to the San Francisco agency of the Hong Kong & Shanghai Banking Corporation, with the request that it be cabled to Hong Kong. This was done. On May 29, 1920, at the request of the buyers, the Crocker National Bank requested the San Francisco agency of the Hong Kong & Shanghai Bank that the letter of credit be amended by cable in a letter stating: "We shall now be greatly obliged if you will send another cable, 'urgent,' amending the credit to cover 500 tons of sugar as follows: 150 tons granulated 350 tons fine granulated." This also was done.

The sugar was duly shipped from Hong Kong, arriving in San Francisco June 29, 1920, in the midst of the "break" in the sugar market which has given rise to so much litigation of just this type. There is evidence in the record that the buyers immediately cabled a flat rejection on the score of deficient quality to the sellers, even before analysis was complete. This fact is not material in the present controversy between the seller and the bank, but the fact that the bank was informed of the buyer's action is significant in considering the reasons and justifications for the refusal of the bank to pay the drafts.

On or about July 6, 1920, the drafts were informally presented to the Crocker National Bank by the Hong Kong & Shanghai Banking Corporation, which had negotiated the

drafts. The drafts were accompanied by commercial invoices, consular invoices, marine and war risk insurance certificates, certificates of marine surveyors, weight certificates, negotiable order bills of lading, and certificates of polarization. After examination of these documents the Crocker National Bank notified the Hong Kong & Shanghai Banking Corporation that it could not accept and pay these drafts, because "the documents are not in order." On July 19, 1920, the drafts were formally presented and acceptance was refused by the Crocker Bank. In the meantime, on July 16, 1920, the buyers, Hind, Rolph & Co., entered into a broad indemnity agreement, supplementing an earlier one, by which they agreed to indemnify the bank for all damages and costs on account of litigation arising out of rejection of the drafts by the bank. The ground for the rejection of the drafts was: "That in none of the documents * * * were the goods and/or merchandise described * * * as required and set forth in said letter of credit."

The bank originally took the position that the documents which were required under the letter of credit must, in all of their terms and in each and every document, specify the goods as called for by the letter of credit. In other words, each document must show that 150 tons white Java refined sugar, 97/98 deg. polarization, and 350 tons white Java refined fine granulated sugar, 97/98 deg. polarization, had been shipped. Later, at the trial, the bank receded from this position as to certain of the documents, still insisting, however, that what it calls the "essential documents"—i. e., the commercial and consular invoices, the surveyor's certificate of quality, and the polarization certificate—must comply literally and word for word with the call of the letter of credit.

[1] The principal question before me in this case is as to whether rejection upon this ground was justified. Any other grounds for objection must be regarded as having been waived. Bank of Taiwan v. Union National Bank (C. C. A.) 1 F.(2d) 65; Geo. A. Moore & Co. v. Mathieu (C. C. A.) 13 F.(2d) 747.

Examination of the documents presented with the drafts shows that the bills of lading, weight certificates, insurance certificates, and commercial invoices describe the article shipped as "bags sugar." The certificates of polarization describe "white Java fine sugar No. 24, * * * sugar (direct polarization) 97.8 deg.," and "granulated sugar, * * * 1,346 bags white Java No. 24, * * * sugar (direct polarization) * * * 98.6 deg." The surveyor's certificates describe "white Java fine sugar No. 24" and "white Java granulated sugar No. 24." The consular invoice covers "white Java fine sugar No. 24" and "white Java granulated sugar No. 24," and contains the declaration: "I further declare, in the case of sugar shipments, that the sugar was refined at Java from raw sugar produced in Java."

[2] The requirements of a letter of credit must be met, like the requirements of any other contract. Conditions in any contract must be performed, and when a letter of credit calls for certain documents the furnishing of all of them is certainly a condition precedent to the payment of the drafts. Furthermore, the documents furnished must comply in every material particular with the conditions in the offer of credit. In construing the letter of credit to determine what are the material conditions precedent to acceptance of drafts, the rules of construction governing the construction and interpretation of ordinary commercial contracts are applicable. Old Colony Trust Co. v. Continental Bank of N. Y. (D. C.) 288 F. 979.

[3] In this connection it should be noted that there is a distinction to be drawn between the legal effect of the contract with reference to what constitutes performance and banking practice as to the nature of the performance preferred. At the trial evidence was introduced tending to show the practice of certain banks to be to require literal, word for word, compliance with the letter of credit in all of the "essential" documents. Doubtless such mathematically accurate compliance with the contract is both convenient and desirable. Convenience and desirability from the standpoint of the bank are not enough, however, to extend the requirements as to the performance of a contract beyond the scope of its plain terms. The question is as to whether the "essential" documents called for by the letter of credit must comply literally and word for word with the call, or whether substantial compliance with every material element of the call, determinable by reading all of the documents together, was sufficient.

[4] Where only one document is to accompany the drafts on a letter of credit, it is clear that that document must comply with the letter of credit. It must show on its face that the goods for which payment is being made were shipped. Lamborn v. Lakeshore Banking & Trust Co., 196 App. Div. 504, 188

N. Y. S. 162, aff'd 231 N. Y. 616, 132 N. E. 911; Bank of Montreal v. Recknagel, 109 N. Y. 482, 17 N. E. 217; Bank of Italy v. Merchants' National Bank, 236 N. Y. 106, 140 N. E. 211. Where, however, several documents are called for, the bank issuing the letter of credit is not entitled to restrict its inspection to one or more documents, and to insist that one or more of them comply literally and word for word with the call of the letter of credit. If all of the documents, read together, show compliance with the call of the letter of credit, the bank is not justified in rejecting the drafts because the documents are not in order.

Any other construction of the letter of credit is strained and contrary to the spirit of common sense controlling commercial transactions. Such a situation was considered by the Supreme Court of Pennsylvania in Camp v. Exchange National Bank, 285 Pa. 337, 132 A. 189. There the letter of credit was for 100 tons of sugar from Java "shipments during July, 1920; * * * the shipments must be completed and drafts drawn on or before August 15, 1920." The documents were a bill of lading, consular invoice, declaration by shipper of food and drug products, certificate of origin, and policies of insurance. The bill of lading was a "received for shipment" bill, and it was contended that the bill of lading made no showing as to time of shipment. The court says:

"If the bill of lading had been the only document accompanying the draft, the bank officers, who were to examine only the papers before them, when the draft was presented, with the sugar not in port, would place the bank in a serious position by payment. But some of the documents accompanying the bill of lading did state sufficient to show shipment as a fact. The seller's declaration, being a part of the documents, speaks of the 'shipment' covered by the invoice as being 'exported from Pasoeroean,' and the contracts of insurance, likewise a part of the same documents, characterize the sugar as being 'in the ship or vessel called Arcturus.' With this information, the bank could very properly regard the sugar as on board the vessel. This would justify the conclusion by the bank that the goods sold were 'shipped' within the letter of credit." 285 Pa. 347, 132 A. 192.

The basic principle is stated (285 Pa. 342, 132 A. at page 191) in this case:

"Banks are liable for the unauthorized payment of drafts, but this liability is not unusual or extraordinary. Where the question of strict compliance is one to be decided by bank officials, they are held to the duty of good faith in forming an honest judgment as to whether the papers attached to a draft correspond to the letter of credit. The integrity of foreign drafts or like bills of exchange, accompanied by commercial bills of lading and other documents drawn against letters of credit, should not be embarrassed or made difficult through technical or inconsequential reasons raised against payment. The holders of these drafts have the right to expect that, when drafts conform in all essential requirements to the letter of credit, they will be paid by the drawee bank."

The courts, when called upon to decide whether or no the documents tendered with drafts on letters of credit were sufficient, have repeatedly and as a matter of course, without discussion, examined all of the documents. Where rejections have been justified, it has been because some essential provision of the letter of credit was lacking from all of the documents. Banco Nacional Ultramarino v. First National Bank (D. C.) 289 F. 169; International Banking Corp'n v. Irving National Bank (C. C. A.) 283 F. 103.

Turning then to the documents presented with the drafts in the present case, the question to be determined is whether these documents, construed together, and without resort to parole or extrinsic evidence, showed that the goods called for by the letter of credit had been shipped. The original letter of credit called for "500 tons (2,000 pounds each) net, "white Java refined granulated sugar, 97/98 deg. polarization, at 20½ cents per pound, gross shipped weight c. i. f. San Francisco; shipment from Hongkong during May/June, 1920."

There has been extensive argument as to whether the amendment cabled May 29, 1920, changed this call entirely, or merely amended the original description as to granulation. Since it is my view that these documents were sufficient under the original call, it is not necessary to hold that the amendment did more than specify a change in the degree of granulation, the remainder of the original call remaining in force.

Examination of the documents shows that the surveyor's and polarization certificates and the consular invoice add "No. 24" to the description "white Java granulated (or 'fine') sugar." It is not necessary to discuss the significance of this phrase. It is not claimed to be inconsistent with any of the requirements of the letter of credit as to the kind of sugar to be shipped, and may be dis-

regarded as being at the most surplusage. After eliminating this phrase it appears that the elements required by the call of the letter of credit are all present; not in any one document, it is true, but within the four corners of the entire set. Reading of all of the documents leaves no doubt that the sugar shipped corresponds to the call. ·

It is claimed that none of the documents show the sugar to be "refined" sugar. There is ground for the contention that the descriptions already quoted, although nowhere using the word "refined," do show that the sugar was refined sugar. But the point is put at rest by the seller's declaration, which is part of the consular invoices, was the basis of issuance, and appears on the reverse side. In it the seller makes declaration that "the sugar was refined at Java from raw sugar produced in Java." This is sufficient.

[5] It is also claimed that the documents are insufficient, in that the 350-ton lot of sugar is nowhere described as "fine granulated"; the word "granulated" being omitted from all of the documents referring to this lot. This lot was described as "white Java fine sugar No. 24" in the polarization and surveyor's certificates and in the consular invoice. If this description as "fine sugar" is as a matter of common knowledge synonymous with the description "fine granulated sugar," the description complies with the call of the letter of credit. Bank of Italy v. Merchants' National Bank, 236 N. Y. 106, 140 N. E. 211; First Nat. Bank of Decatur v. Home Savings Bank, 21 Wall. 294, 22 L. Ed. 560. As said by Judge Hand in McNeil & Higgins v. Czarnikow-Rienda Co. (D. C.) 274 F. 397: "It is argued that 'fine' means 'excellent,' 'superior,' or 'pure'; but that, I should say, was not so. 'Fine granulated' normally would mean 'finely granulated,' and refer to the size of the granules. At least, that would be its meaning, unless the trade means something else."

There is no evidence in this case that the trade refers to anything but the fineness of granulation in using the phrase "fine granulated." The natural inference would therefore be that sugar described as "fine sugar" would be "fine (granulated) sugar." The evidence shows that this was the understanding of the trade. The broker who negotiated the sale and the amendment of the call of the letter of credit with reference to the granulation, when asked, "And of course, where it says '350 tons fine' and the word 'granulated' is not in it, it evidently meant fine granulated"? answered, "I took it to mean that." An expert called on behalf of inter-

veners to testify as to the quality of the sugar received was asked, "Is there a distinction * * * between a fine sugar and a fine granulated sugar?" and answered, "I do not think there is." In other words, the record shows affirmatively that the trade applied the descriptive word "fine" to sugar in the same sense that the ordinary man would use it; i. e., referring to granulation, and meaning "fine granulated," even though the latter word was omitted. The description in the documents must be considered as synonymous with that called for by the letter of credit.

The insistence on technical accuracy by the bank has placed it in the position of rejecting drafts which should have been accepted. Plaintiffs are entitled to recover.

Two points remain to be settled; the measure of damages, and the rights of the intervener in the premises.

[6] It is argued that plaintiff is entitled to recover only the difference between $208,-000 and the gross resale price of the sugar, on the theory that the bank was buying documents, not sugar, and that customs duties, warehouse, hauling, weighing, and brokerage charges incident to the resale could be recovered only against the buyers, Hind, Rolph & Co. With this theory I disagree. Plaintiff is entitled to use the net resale price—i. e., the price received, less the proper expenses of sale—in computing damages. O'Meara Co. v. National Park Bank, 239 N. Y. 386, 146 N. E. 636, 39 A. L. R. 747; Border National Bank v. American National Bank (C. C. A.) 282 F. 73. Accordingly, plaintiff is entitled to recover damages in the sum of $53,969.59, with interest from July 19, 1920, the date of the rejection of the drafts.

[7] In considering this case I have confined myself to the issues made by De Sousa & Co. and the bank, upon the contract embodied in the letter of credit. Interveners sought to broaden the issues by introducing evidence to show that the sugar received was of poor quality and did not comply with the terms of the contract between De Sousa & Co. and Hind, Rolph & Co. Whatever the rule may be, where the intervention is antagonistic to both plaintiff and defendant, and allowed because intervener claims an interest in the subject-matter of the suit, where the intervener joins either plaintiff or defendant in resisting the claims of the other side, he is not entitled to enlarge the issues. Boskowitz v. Thompson, 144 Cal. 724, 78 P. 290; Leaver v. K. & L. Box & Lumber Co. (D. C.) 6 F.(2d) 666. In the present case evidence of breach of the contract of sale between

De Sousa & Co. and Hind, Rolph & Co. is not admissible under the issues framed by the main action, on the letter of credit. Bank of Taiwan v. Union National Bank (C. C. A.) 1 F.(2d) 65. The indemnity agreement between the bank and Hind, Rolph & Co. furnished a basis for permitting Hind, Rolph & Co. to assist in the defense, but defensive matter arising out of the breach of another contract than the one sued upon is not available to assist the bank's case, whether introduced by the bank or by the intervener.

Each of the parties has requested special findings. In view of the discussion of the facts herein contained, special findings will be denied, and exception noted.

Let judgment be entered for plaintiffs in the sum of $53,969.59, with interest from July 19, 1920.

So ordered.