John TALBOT, Jr., and wife, Algene C. Talbot, Plaintiffs-Appellants,

v.

BANK OF HENDERSONVILLE, Defendant,

First American National Bank of Nashville, Defendant-Appellant,

W. J. Cole, Defendant.

Court of Appeals of Tennessee, Middle Section.

Dec. 29, 1972.

Certiorari Denied by Supreme Court June 4, 1973.

Trabue, Minick, Sturdivant & Harbison, Nashville, Carl H. Oldham, Hendersonville, for plaintiffs-appellants.

Bass, Berry & Sims, Nashville, for defendant-appellant.

## OPINION

TODD, Judge.

The plaintiffs, John Talbot, Jr., and wife, Algene C. Talbot, sued the defendant, First American National Bank for $22,904.81 for wrongfully paying a draft and charging same to plaintiffs' bank account. The Chancellor awarded judgment to plaintiffs in the amount of $5,000.00, and both plaintiffs and said defendant bank have appealed.

Plaintiffs' suit against the defendant, Bank of Hendersonville, was dismissed by the Chancellor, and no appeal was taken from this action.

The only relief granted against the defendant, W. J. Cole, was an injunction to restrain foreclosure of a trust deed, which injunction was continued "pending further orders of the Court." No appeal was taken from this action.

Thus, the only controversy before this Court on this appeal involves the damage suit of plaintiffs against the defendant, First American National Bank (hereafter referred to as "First American" or "the bank").

The plaintiffs' only assignment of error is as follows:

"The Court erred in failing to award the plaintiffs a recovery against First American National Bank for the full amount paid by it under the Letter of Credit, plus interest thereon from January 4, 1971."

The bank has assigned five errors. The first insists that plaintiffs are not entitled to recover anything. The second and third complain of certain findings of fact. The fourth and fifth complain of the admission of certain evidence.

There is no material conflict in the evidence.

At and prior to the inception of this controversy, the plaintiff, John Talbot, Jr., (hereafter referred to as "the plaintiff" in the singular) was engaged in the business of selling and installing burglar alarms under the trade name "Safe-Guard, U.S.A." Plaintiff had previously purchased alarm systems from a manufacturer in Japan named Motoda Electronics Co., Ltd., (hereafter referred to as "Motoda"). Plaintiff desired to make a further and substantial purchase from Motoda.

In order to establish credit for said purchase, both of the plaintiffs executed to said Bank of Hendersonville a note for $25,000.00, due one day after date and secured by deed of trust to W. J. Cole. The Bank of Hendersonville credited plaintiffs with $25,000.00 on its books and arranged for First American to issue a letter of credit upon request of plaintiff by authorizing First American to charge to the Bank of Hendersonville any amount paid under said letter of credit.

Pursuant to said arrangements, plaintiff orally requested the bank to issue said letter of credit. The bank prepared a written application for said letter of credit which was intended for the signature of plaintiff, but he never signed it. Plaintiff admits, however, that said application conformed to his instructions and that he would have signed it if requested to do so. Plaintiff further admits that the letter of credit which was issued did conform to his instructions and the said unsigned application.

On August 10, 1970, First American issued to Motoda its letter of credit, as follows:

"We hereby authorize you to draw on First American National Bank of Nashville, Tennessee

For Account of Safe Guard, U.S.A., No. 17, Walton Mall, Hendersonville, Tennessee

Up to the Aggregate Amount of $24,600.00 ($Twenty Six [sic] Thousand Six Hundred Dollars)

Available By Your Draft(s) At Sight for 100% invoice

Cost to Be

Accompanied by the Following Documents

Commercial invoice stating that it covers 101 No. 418 Alarm Units consisting of Part 301, #12 Siren and Remote Switch, plus additional 202 Antenna-B and one 500–S (5 Unit)

Special customs invoice

Marine insurance policy or certificate Full set of "On Board" ocean bills of lading, evidencing shipment to New Orleans, drawn to order to First American National Bank, Nashville, Tennessee, with notification to V. Alexander and Co., 624 Gravier Street, New Orleans, La.

Packing List.

Additional Provisions

Insurance to be effected by Seller

Partial shipment not permitted. Transhipment not permitted.

Bills of Lading must be dated not later than November 10, 1970

Bills of Exchange must be negotiated not later than November 20, 1970

This credit is subject to the uniform customs and practice for documentary credits (1962. Revision). International Chamber of Commerce Brochure No. 222

We hereby agree with the drawers, endorsers and bona fide holders of drafts drawn under and in compliance with the terms of this credit that such drafts will be duly honored on due presentation to the drawee."

On or about October 28, 1970, plaintiff sent a telegram from Japan to First American, as follows:

"Hold payment LC 684 if possible"

On November 16 or 17, 1970, First American received through regular international banking channels a draft requesting payment of $22,847.69 for account of Motoda. Attached to said draft were the documents described in the letter of credit, supra. The invoice contained the following description of the shipment:

| "Burglar Alarm Unit | | | |
|---|---|---|---|
| Safe-Guard ME–418 (with Antenna Cord 2000m) | 101 sets at US $125.00 | | US $12,625.00 |
| Safe-Guard ME–500s | 1 set | $530.00 | $ 530.00 |
| Dialer ME–310 | 101 ea | $ 39.00 | $ 3,939.00 |
| Siren | 101 ea | $ 8.00 | $ 808.00 |
| Remote Switch | 101 ea | $ 10.00 | $ 1,010.00 |
| Antenna–B | 202 ea | $ 16.00 | $ 3,232.00 |
| Total: 102 sets & 505 ea F.O.B. Japan | | | US $22,144.00 |
| | | Insurance | 175.89 |
| | | Freight | 527.80 |
| | | C.I.F. New Orleans | US $22,847.69" |

Said invoice also contained the following notation in type differing from the above quotation:

"It covers 101 No. 418 Alarm Units consisting of part 301, # 12 Siren and Remote Switch, plus additional 202 Antenna-B and one 500–S (5 Unit)"

First American notified plaintiff of the arrival of said draft and withheld payment of same until December 31, 1970, when payment was made.

During the interval from the presentation of said draft to the payment thereof, there were a number of conferences be-

tween plaintiff and officials of First American wherein plaintiff explained that the shipment described in the papers accompanying the draft did not include the merchandise ordered. In particular, plaintiff insisted that Motoda had substituted a "310 dialer" for the "301 dialer" ordered.

After payment of the draft on December 31, 1971, First American charged to the Bank of Hendersonville the amount of $22,904.81, which amount was charged against the credit of $25,000.00 created by the loan previously negotiated by plaintiffs.

So far as this record shows, the shipment has never been accepted by plaintiff and is held at the Port of New Orleans awaiting his orders.

The Chancellor found:

". . . that the defendant, First American National Bank, was negligent or did not exercise reasonable care or the care required in approving and paying the Letter of Credit described in the Bill; but it also appearing that the damages suffered by the plaintiffs by reason of the wrongful payment of the said Letter of Credit is $5,000 . . ."

Judgment was accordingly decreed in favor of plaintiffs and against First American for $5,000.00.

The amount awarded by the Chancellor was his estimate of the amount of damage suffered by plaintiff by the substitution of the "ME–310 Dialer" for the "ME–301 Dialer" as ordered.

On appeal, it is conceded that the determinative question herein is whether or not the papers attached to the draft presented to First American were in compliance with the letter of credit, quoted supra.

On behalf of First American, it is insisted that the invoice, quoted supra, contained verbatim the specifications of the letter of credit; i. e.,

"It covers 101 *No. 418 Alarm Units consisting of Part 301*, #12 Siren and Re-

mote Switch, plus additional 202 Antenna–B and one 500–S (5 Unit). (Emphasis supplied)

Plaintiffs insist, however, that the previously quoted excerpt from the invoice was an obvious alteration of the original invoice inconsistent with the original provisions of the invoice which included:

101—ME–418 sets
101—ME–310 Dialers.

■ Plaintiffs insist that the inclusion of 101 ME–*310* Dialers and the omission of "Part 301" in the original draft of the invoice was a clear indication that the ME–310 Dialers had been substituted for "Part 301" required by the letter of credit. To sustain this insistence would require the Chancellor, and this Court, to presume that "ME–310 Dialer" was inserted in the invoice as a substitute for "Part 301," or to act upon the testimony of plaintiff that he had been told by Motoda officials that such a substitution had taken place.

■ The obligation of First American to honor its letter of credit was conditioned and limited only by the terms of said letter. It had no legal right to refuse payment of the draft merely because of hearsay information conveyed to it by plaintiff. The invoice certified (albeit by apparent insertion or addition) that the shipment complied with the terms of the letter of credit. First American had no right to question the truthfulness of the invoice as received.

Plaintiffs insist that said invoice was not "regular on its face," hence was not entitled to full faith and credit when presented with the draft.

§ 47–5–109, T.C.A., provides in part:

"(2) An issuer must examine documents with care so as to ascertain that on their face they appear to comply with the terms of the credit but unless otherwise agreed assumes no liability or responsibility for the genuineness, falsifi-

cation or effect of any document which appears on such examination to be regular on its face."

■ The obvious fact that a notation has been superimposed upon an invoice to certify compliance with a condition of the letter of credit does not prevent the invoice from being "regular on its face." To hold otherwise would require that all parts of all documents be prepared by the same printing device and would preclude the use of stamped or written notations thereon.

■ Of course, an obvious inconsistency between two notations on the same document would prevent the document from being regular on its face. For example, if the portion of the invoice, first quoted supra, had read, "Safe-Guard ME–418 *without Part No. 301* . . . ," and the second notation on the invoice, quoted supra had read, "No. 418 Alarm Units *consisting of Part 301* . . . " then there would have been an obvious inconsistency and the document would not have been regular on its face. Such supposed direct inconsistency did not occur. The first item on the invoice consisting of 101 sets, Safe-Guard ME–418 contains nothing to indicate what parts are or are not included in each "Set, ME–418." The added notation certifies that each No. 418 Alarm Unit contains a Part No. 301. Thus there is no inconsistency between the first quoted portion of the invoice and the second.

Plaintiff's insistence that the shipper substituted a "Model 310 dialer" for the "Part 301" specified in the letter of credit is based upon hearsay information and assumptions made by the plaintiff, and cannot be supported by the instruments themselves. There is no indication on the letter of credit as to the nature of "Part 301," other than that it is part of a No. 418 Alarm Unit. There is no indication on the invoice that the third listed item, "Dialer ME–310" is a part of the first listed item, "Safe-Guard ME–418." So far as the invoice shows, the 101 ME–310 Dialers were

shipped separately and in addition to the 101 ME–418 sets.

■ Plaintiff insists (and testified over objection) that he was personally informed by officials of Motoda that the inferior ME–310 Dialer had been substituted instead of the ME–301 Dialer (Part 301). Since Motoda is not a party to this case, hearsay evidence of statements of its officials is incompetent and cannot be considered. Moreover, the final form of the invoice, dated November 10, 1970, is such as to certify that the shipment, as finally packed and dispatched, contained 101 "Part 301," which plaintiff states is a ME–301 Dialer.

Although not determinative of this appeal, it is worthy of note that no steps were taken to establish conclusively whether the shipment actually contained the desired ME–301 Dialers. So far as this record shows by competent evidence, the desired dialers were actually included.

■ Plaintiffs cite T.C.A. § 47–5–113 to the effect that the bank seeking to collect a draft *may* give an indemnity to induce payment in case of defects in documents; however, nothing in this statute *requires* a bank honoring its own letter of credit to demand indemnity before payment.

■ Plaintiffs rely upon Article 16 of International Chamber of Commerce Brochure No. 222 as follows:

*"Article 16.*—A clean shipping document is one which bears no superimposed clause or- notation which expressly declares a defective condition of the goods and/or the packaging.

Banks will refuse shipping documents bearing such clauses or notations unless the credit expressly states clauses or notations which may be accepted."

However, said provision relates to notations of defective condition or packaging, and has no application to the present controversy.

Plaintiffs insist that every detail of a letter of credit must be complied with, and that this means that the description set out in the letter of credit must appear in all of the required shipping documents. Plaintiffs point out that the description required by the letter of credit does not appear in the "Special Customs Invoice," "Maritime Insurance Policy," "On Board Ocean Bills of Lading" or the "Packing List," all required by the letter of credit.

Authorities cited by plaintiffs do not support their foregoing insistence. In Anglo-South American Trust Co. v. Uhe, 261 N.Y. 150, 184 N.E. 741 (1933), one of the documents (an inspection certificate) was completely missing, and no question was made as to the specific contents of any document.

In Laudisi v. American Exchange Nat'l. Bank, 239 N.Y. 234, 146 N.E. 347 (1924), the purchaser sued the bank which issued a letter of credit and paid a draft thereunder for a shipment of grapes claimed to be inferior. The letter of credit specified shipment of "Alicante Bouchez Grapes," and required invoice and bill of lading to accompany draft. The bill of lading attached to the draft described the shipment as "grapes." The invoice, also attached to the draft, described the shipment fully in the terms of the letter of credit. The New York Court of Appeals sustained a demurrer and said:

"Thus the two instruments together showed a shipment of the articles which plaintiff's contract of sale called for and which fully warranted the payment of the draft, but the plaintiff says that this is not sufficient. He argues that the bill of lading by itself should have shown a shipment of the particular kind of grapes called for by his contract and specified in the letter of credit, and that the defect in the description contained in it cannot be remedied by the invoice made out by the vendor in New York City. He cites no case which, in our opinion, sustains the contention, nor are we

aware of any such one, and the allegations of the affidavits presented on the application for judgment do not sustain such contention." 146 N.E. at p. 348

Other authorities cited by plaintiffs are likewise not determinative of the present question.

The letter of credit, itself, answers plaintiff's insistence presently under consideration. The requirements for details are set out in the paragraph beginning with the words, "commercial invoice," and are applicable only to that instrument. Other instruments are listed with no required contents (Special Customs Invoice, Marine Insurance Policy, Packing List), or with entirely different requirements ("on Board Ocean Bills of Lading"). Thus, the letter of credit itself shows that only the Commercial Invoice was required to "state that it covers, etc. . . . . ."

Furthermore, International Chamber of Commerce Brochure No. 222, incorporated in the letter of credit by reference, states:

"The description of the goods in the commercial invoice must correspond with the description in the credit. In the remaining documents the goods may be described in general terms."

Plaintiffs cite T.C.A. §§ 47–3–302, 47–3–304, and 47–3–407 for the proposition that a holder is not a holder in due course if the instrument as signed has been altered. There is no evidence that the instrument (the draft) was ever altered, and there is no evidence of any alteration of the invoice after being signed. Since invoices are not customarily signed, it is doubtful that the cited statutes refer to invoices attached to negotiable instruments. Also, the position of First American does not depend upon any rights of a holder in due course, but rather upon its direct obligation to Motoda under its letter of credit.

Plaintiffs cite Banco Espanol de Credito v. State Street Bank and Trust Co., 409 F. 2d 711 (1 Cir. 1969), however in that case the collecting bank for the drawer was al-

lowed to recover from the bank which issued the letter of credit under a finding of fact that the collecting bank was a holder in due course. Also, in that case, the defense was fraud outside the required documents. The letter of credit required a certificate of inspection that the goods were "as sample inspected in Spain." The certificate so stated, but defendant insisted that the shipper had caused the wrong samples to be used. Thus, the issuer of the letter of credit was held liable on the basis of the required documents in spite of defective quality of goods.

Plaintiffs insist that testimony is admissible to show the meaning of terms, citing Bank of Italy v. Merchants Nat. Bank, 236 N.Y. 106, 140 N.E. 211 (1923), wherein a bank guaranteed payment for "dried grapes" and refused payment on a bill of lading for "raisins." The court sustained the refusal to pay and dismissed the bank. The Court said:

"[2] As we have seen in the case before us, the Merchants' Bank agreed to make payment upon bills of lading of cars of 'dried grapes.' The bills presented to it were for 'raisins.' It is said that the two expressions are identical; that the trial court so found upon evidence which permitted that inference. It may be so. That, however, is not sufficient. We agree that, if the words used in the guaranty and in the bill of lading were as a matter of common knowledge synonymous, or if the guaranty covered a certain class of objects and the bill was for one species of that class, no question could arise. If the guaranty covered automobiles, and the bill was for motor cars; if the guaranty was for grain, and the bill for wheat—the variance would be immaterial. So, too, if the course of dealing between the parties had been such that they might be held as a matter of law to have affixed their own meaning to the terms employed. Decatur Bank v. St. Louis Bank, 88 U.S. (21 Wall.) 294, 22 L.Ed. 560. But, where there is a question of fact as to whether the terms used in the guaranty and in the bill of lading are in truth identical, the risk of determining for itself this question is not to be placed upon the guarantor. Common words are by trade usage frequently given a particular meaning. 'Hudson seal' is the skin of muskrats. Unquestionably 'raisins' are dried grapes. It does not follow that in commercial usage 'dried grapes' are 'raisins.' 'Dried grapes' may be a technical term describing a distinct product. Indeed, there is considerable evidence before us tending to show that this is so. Raisins we are told are dried white grapes. 'Dried grapes' is the trade-name of dried black grapes. The articles, it is said, are distinct. Their prices are quoted separately in trade journals. If this be so; if there be a substantial dispute upon that point, and we think that the evidence tends to show that this is true —the guarantor is not required to decide the fact at his peril." 140 N.E. at p. 212

Plaintiffs also cite Asociacion de Azucareros de Guatemala v. U. S. Ntl. Bk. of Oregon, 423 F.23 638 (9 Cir. 1970), wherein the bank guaranteed payment for . . . "Raw Centrifugal Sugar . . . 96 degrees minimum polarization." Since "Raw Sugar" had a well defined meaning in terms of polarization, the word "Minimum" was held to be a superfluity and meaningless. Furthermore the Court held:

"[4, 5] The letter of credit, unlike the classic surety undertaking, is a primary obligation between the issuer and the beneficiary. Uniform Commercial Code, § 5–114(1), comment 1. The agreement, as here, is to pay on presentation of shipping documents and may well arise even before the buyer receives the goods. The issuer is not concerned with the state of affairs between the buyer and seller. He is concerned only with the evidence of shipment and is bound to honor his promise 'regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the bene-

ficiary. Ore.Rev.Stat. 75.1140(1) ; Uniform Commercial Code, § 5–114(1). *See* Dulien Steel Prod. Inc. of Wash. v. Bankers Trust Co., 298 F.2d 836 (2d Cir. 1962). If it were otherwise, letters of credit could not safely be honored until after delivery of the goods. No issuer could safely accept the risk of paying against documents. The unique commercial usefulness of the letter of credit as a vehicle of rapid and guaranteed payment in commercial transactions would be destroyed. *See*: Hershey, Letters of Credit, 32 Harv.L.Rev. 1, 14 (1918)." 423 F.2d at p. 641

■ Conceding, for the purpose of this consideration, that evidence was admissible to show the meaning of the expressions "Part 301," "ME–310 Dialer," and "ME–301 Dialer"; and conceding that plaintiffs have proven that "Part 301" means the same as "ME–301 Dialer," and that "ME–310 Dialer" is an inferior substitute for "ME–301 Dialer," all of this would not relieve First American of liability on its letter of credit or entitle plaintiffs to recover hereon. The reason for this is that the commercial invoice certifies shipment of 101 Model 418 Alarms, without describing said Alarms as containing any particular dialer 301 or 310. A separate item lists 101 ME–310 Dialers as being included in the shipment, and still another item certifies that Part 301 (ME–301 Dialer) is included as part of the shipment. Accepting plaintiff's argument and evidence, there still is no evidence that the ME–301 Dialers were not included in the shipment in addition to the ME–310 Dialers.

Plaintiffs insist that testimony is admissible to show that the customer kept the bank informed as to his dealings with the beneficiary of the letter of credit, citing Banco Espanol de Credito v. State Street Bank and Trust Co., 385 F.2d 230 (1 Cir. 1967) ; however, in a subsequent opinion in the same case (supra) the defenses were rejected and the holder of the letter of credit was allowed to recover. Nothing is found in the cited opinion to warrant recovery by plaintiffs herein. The Court said,

"We hold that the inspection certificate in this case conformed in all significant respects to the requirements of the letter of credit." 385 F.2d at p. 237

Plaintiffs also cite Dulien Steel Products, Inc. v. Bankers Trust Co., 298 F.2d 836 (2 Cir. 1962) which is, in many respects, identical with the present case. Dulien sued the Bank for alleged negligent payment of $60,500.00 under a letter of credit issued on certain conditions. Dulien made two claims (a) that the bank paid contrary to instructions received from Dulien and (b) that the bank failed to give notice to Dulien that it proposed to disregard instructions and make payment. The Court said:

"Involved here is an irrevocable letter of credit providing for payment 'without question' once the following terms were met: (1) presentation of a simple receipt and (2) notification from the Seattle Bank that certain documents had been negotiated. Both conditions were admittedly fulfilled.

"[2] The duties of a bank under a letter of credit are created by the document itself, the bank being deprived of any discretion not granted therein.

'But in any case the bank has the power and is subject to the limitations which are given and imposed by this authority. If it keeps within the powers conferred it is protected in the payment of the draft. If it transgresses those limitations it pays at its peril. A customer having the right to prescribe and phrase limitations as he desires, it is our duty to give to language its ordinary and sensible meaning which will neither destroy the protection which the customer has exacted, nor, on the other hand, impose upon the bank some obligation not fairly warranted by the language

which has been adopted by the parties.' Laudisi v. American Exchange Nat. Bank, 239 N.Y. 234, 239, 146 N.E. 347, 348 (1924).

"Plaintiff seeks to impose a further duty on Bankers to go beyond the terms of the letter of credit and investigate 'the fraud being attempted against plaintiff.' But as Chief Judge Hiscock points out in Laudisi: '[T]he bank is not obliged to assume the burdens of a controversy between the vendor and vendee and incur the responsibility of establishing as an excuse for not paying a draft that the vendee's version is the correct one' (239 N.Y. 234, 243, 146 N.E. 347, 350); see also: O'Meara Co. v. National Park Bank, 239 N.Y. 386, 146 N.E. 636, 39 A.L.R. 747 (1925)." 298 F.2d at pp. 840, 841

Plaintiffs rely upon the action of First American in holding the draft without payment for nearly six weeks. The statutory provision for dishonor if not paid within three days (T.C.A. § 47–5–112) is inapplicable, because First American was bound by an irrevocable letter of credit, and acceptance or dishonor could not affect the rights of the holder of the draft. T.C.A. § 47–5–115.

The long delay in payment is not an admission of the bank that the papers were defective; rather it was an effort by the bank to be sure of its position in the face of the protests of plaintiff, and to give plaintiff an opportunity to extricate himself from his difficulty. Apparently, he made no effort to do so, but relied upon the bank to protect him by refusing payment.

Other authorities favor the position of First American. See 50 Am.Jur.2d, Letters of Credit, §§ 19 et seq., pp. 414 ff; 13 A. L.R. 166, 30 A.L.R. 353; 39 A.L.R. 751; 53 A.L.R. 57, 71; 9 C.J.S. Banks and Banking § 179, p. 393.

First American was unquestionably obligated to honor the draft, and would have been liable for failure to do so. Under such circumstances, it could not be expected to embarrass its standing with other banks engaged in international finance by refusing payment of a valid obligation, especially when its counsel repeatedly advised payment.

This view of the merits of the case renders unnecessary any further consideration of the assignments of error.

The predicament in which plaintiffs have placed themselves is indeed regrettable. Initially, plaintiff saw fit to initiate a transaction exceeding $20,000.00 by a telephone call. When he received written confirmation, he noticed a slight inadequacy of wording, but failed to challenge it, and now agrees that the confirmation conformed to his instructions.

Plaintiff had adequate notice of the purpose of his seller to violate his shipping instructions, so that he (plaintiff) could have taken steps to protect himself. While he was in Japan, he had the opportunity of obtaining from his seller exact and detailed lists of what was, or was not, shipped. Upon his return to this country, he had ample opportunity to file suit to enjoin payment of the draft. See 50 Am.Jur., Letters of Credit, §§ 22, pp. 417, 418. In such a suit, evidence could have been presented as to the actual contents of the shipment. Such a suit would doubtless have produced an offer of an indemnity agreement to procure payment of the draft without peril of loss to plaintiff.

Instead, plaintiff chose to do nothing except to urge the bank to default on its obligation.

Plaintiff received necessary documents to enable him to claim his shipment at the Port of New Orleans; but, by his own admission, he failed to do so and has no idea of the disposition made of the shipment. Without an examination of the shipment, itself, it can never be known whether or not the shipment actually contained 101 ME–301 Dialers as desired by plaintiff.

This Court sympathizes with plaintiffs in their heavy loss. However, the defendant bank cannot be required to bear a loss which did not result from any wrongful conduct on its part.

The decree of the Chancellor is reversed. The suit of plaintiffs against First American National Bank is dismissed. The cause is remanded for further appropriate proceedings relating to the injunction against W. J. Cole, Trustee. All costs, including costs of this appeal, will be taxed against plaintiffs.

Reversed and Remanded.

SHRIVER, P. J., and PURYEAR, J., concur.