# Camp et al., Appellants, *v.* Corn Exchange National Bank.

*Banks—Negotiable instruments—Bills of exchange—Letters of credit—Payment of drafts—Contract—Bills of lading—Discretion —Abuse—Estoppel.*

1. Banks are liable for the unauthorized payment of drafts, but this liability is not unusual or extraordinary.

2. Where foreign drafts are drawn under a letter of credit and the question of strict compliance as to payment is one to be decided by the officials of the bank issuing the letter of credit, the officials are held to the duty of good faith in forming an honest judgment as to whether the papers attached to a draft correspond to the terms of the letter of credit.

3. The holders of such drafts have the right to expect that when drafts conform in all essential requirements to the letter of credit, they will be paid by the drawee bank which has issued the letter.

4. Payment should not be made difficult through technical or inconsequential objections raised against payments.

5. There is no reason for relaxing such rule as between the vendee of the merchandise consigned, or party arranging for the letter of credit, and the drawee bank which has accepted a draft drawn under the letter.

6. The drawee bank has no right, by precipitate payment, to impose conditions on a vendee not contained in a letter of credit or contract.

7. It should not be visited with liability for a mistake in the judgment of its officer honestly made in determining strict compliance; and, on the other hand, it should not escape responsibility where, from an examination of the papers accompanying the draft, it is apparent they do not conform to the letter of credit; the discretion of the bank officials must not be abused.

8. As between the drawee and holder, where payment is to be made of a sight draft, the papers must strictly comply with the conditions set forth in the letter of credit or the agreement accompanying it.

9. The parties to a contract providing for drafts to be issued under a letter of credit have the right to stipulate the conditions under which drafts so issued should be honored.

10. Such conditions should be given effect, and banks disregarding them by payment do so at their peril.

11. In construing the terms of a letter of credit, they are subject to the same rules of construction as ordinary commercial contracts; and it seems that under certain circumstances parol evidence may be introduced to show a special trade meaning or custom.

12. Where a bill of lading accompanying a draft contains written notations relieving the ship carrying the goods from certain liabilities, such notations do not render the bill of lading so "unclean" as to stop payment of the draft, if it appears that such notations are substantially reiterations of what is contained in the printed part of the bill.

13. The payee bank is in duty bound to examine all the papers for discrepancies, but it is not required to look to any other documents than those specified in the letter of credit, to determine whether there has been a compliance therewith; nor, when the language of the letter is clear and unambiguous, does it require the aid of parol evidence.

14. Where the contract for a letter of credit and the letter itself require shipment on or before a date named, but does not require an "on board" bill of lading, and the bill of lading is silent as to whether the shipment had been actually made or the merchandise was on board of the vessel named in the bill, the drawee bank is justified in paying the draft, if it appears from other papers accompanying the bill of lading that the shipment was on board the vessel named and within the terms of the letter of credit.

15. Where the person contracting with the bank for the letter of credit objects to the bank making payment of the draft and enumerates several reasons therefor, such as the notations on the bill of lading, but fails to object on the ground that there was no clear proof of shipment, he is estopped from making such objection after the bank has paid the draft and litigation ensues.

16. Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his reason, and put his ground on another and different consideration.

17. Where a drawee bank under a letter of credit refuses to pay a draft at the request of its customer, to whom it had issued the letter, and acquiesces for a time in the customer's view as to the invalidity of the draft, but finally pays after it has satisfied itself of its legality, the customer cannot claim damages for the delay resulting from a fall in the price of the goods involved in the shipment, inasmuch as the delay was the result of his persistent effort to secure nonpayment of the draft.

Argued November 27, 1925. Appeal, No. 337, Jan. T., 1925, by plaintiffs, from judgment of C. P. No. 3, Phila. Co., March T., 1923, No. 9287, for defendant n. o. v., in case of George R. Camp et al., Trustees of E. R. Sherburne Co., and the Continental Products Corporation v. Corn Exchange National Bank. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Assumpsit for alleged wrongful payment of draft issued under letter of credit. Before DAVIS, J.

The opinion of the Supreme Court states the facts.

Verdict for plaintiffs for $370,854.28, on which judgment n. o. v. was entered for defendant. Plaintiffs appealed.

*Error assigned* was judgment n. o. v., quoting it.

*Stevens Heckscher,* of *Duane, Morris & Heckscher,* for appellants.—Defendant bank was guilty of unreasonable delay under all the facts of the case in waiting 52 days in the face of a falling market before deciding to accept the draft: Old Colony Trust Co. v. Lawyers T. & T. Co., 297 Fed. 152; Banco Nacional Ultramarino v. Bank, 289 Fed. 169; Brazilian Bank v. British Banking Corp., 18 L. T. T. (1868).

Defendant did exercise a reasonable and honest discretion in approving the shipping documents and accepting the draft, under all the testimony in the case.

There was a conflict of testimony upon the question whether under the customs of the trade the shipping documents were correct and in accordance with the provisions of the letter of credit, which required submission to a jury: Fisher v. Minot, 76 Mass. 260; Leadon v. Havemeyer, 121 N. Y. 179; Harrison v. Fortlage, 161 U. S. 57; Lamborn & Co. v. Products Co., 291 Fed. 435.

*Edward Hopkinson, Jr.,* for appellee.—Where a party gives a reason for his conduct, and decision touching

anything involved in a controversy, he cannot after litigation has begun change his ground and put his conduct upon another and different consideration: Railway Co. v. McCarthy, 96 U. S. 258; International Banking Corp. v. Bank, 274 Fed. 122; Grimwood v. Munson, 273 Fed. 166; Honesdale Ice Co. v. Improvement Co., 232 Pa. 293.

Appellee relies upon the equally well established principle that a general objection, such as "also documents not in accordance with letter of credit" is not sufficient to permit the subsequent raising of specific objections to the documents which might have been assigned as reasons for refusal at the time, but were not: Gregg v. Von Phul, 68 U. S. 274; Ins. Co. v. Hope, 58 Ill. 75; Virginia F. & M. Ins. Co. v. Goode, 95 Va. 762.

Each of the notations in question is covered by provisions in the printed bill.

As a matter of law the requirement of the contract calling for "shipment during July, 1920," should be interpreted as meaning exactly what it says. It cannot be interpreted as necessarily requiring the goods to be actually placed on board the vessel or that the vessel will sail during July: Victor v. Nat. Bank., 193 N. Y. S. 868; Taiwan Bank v. Nat. Bank, 1 Fed. (2d) 65.

The liberty or power of acting without other control than their own judgment or independent determination was left to the officers of the bank: Adams R. & Boiler Works v. Schnader, 155 Pa. 394.

OPINION BY MR. JUSTICE KEPHART, January 4, 1926:

Appellee issued a letter of credit for $397,000 subject to a sixty-day sight-draft with full sets of shipping documents attached, drawn under it by the Swedish East India Company of Java. The letter was issued May 8th, and was to cover the price of 100 tons of sugar purchased in Java. On September 23, 1920, a draft, with the necessary documents, for the above sum, less $1.65, was informally presented to appellee by the Japanese Bank of

Taiwan, the owner. The documents consisted of a bill of lading, consular invoice, commercial invoice, declaration by shipper of food and drug products, certificate of origin of sugar and policies of insurance. The bill of lading, in addition to the printed provisions, had written across its face, in red ink, special notations setting forth that the steamer was not responsible for bursting of bags and loss of contents or for liquefaction of sugar. Other typewritten notices set forth that all expenses incurred at the destination, such as repairing packages, including cost of materials, should be paid by the consignee before delivery; and that the steamer was not responsible for breakage or loss of contents due to frail packages. Appellants decided that the bill of lading was not a correct or "clean" bill because of the notations on its face, and not in accordance with the letter of credit. They instructed the bank to make no payments on it under the latter. Afterwards the draft, with the documents attached, was formally presented to appellee when it was decided by Camp and representatives of appellee to refuse to accept the draft for the reason above stated. Later, Camp and his coplaintiffs notified appellee not to pay, and agreed that, if the matter remained unadjusted for thirty days, satisfactory security indemnifying appellee from loss would be given. The president of the drawee bank, about October 29th, informed appellants that, unless a bond was furnished, the draft would be paid. No bond having been furnished, and appellee meanwhile having secured additional data to meet the objections, and having been given a bond of indemnity by the Bank of Taiwan, paid the draft November 19th. Plaintiffs, claiming to be injured, brought this suit.

The difficulty arose over the falling price of sugar, the difference in price on this cargo amounting to $290,-000. The court below submitted the case to the jury, who found for plaintiffs in the sum of $297,000. Upon further consideration, it held the plaintiffs were not

entitled to damages for delay; judgment n. o. v. was accordingly entered.    From this action plaintiffs have appealed.

The first question presented is, Whether, in the commercial treatment or handling of foreign drafts or like bills of exchange, any notations on a bill would be sufficient cause for the bank to withhold payment.    Second: The contract having made the payment of the draft a discretionary matter with the appellee, was payment, in view of all the circumstances, a matter of good faith, or was it an abuse of discretion?    Third: Was the bank liable for the damages occasioned by delay in payment from the time the draft was presented until actually paid?

In determining whether the typewritten and red ink notations on the bill of lading are alone sufficient to condemn the draft as being in violation of the letter of credit, resort must be had to the rule of law governing the rights between the drawee of such bill of exchange and his customer who has engaged to reimburse him. The contest is between the latter parties, not between the drawee and the drawer or holder.

The bank was a purchaser of documents attached to the sight draft.    As between the drawee and holder, where payment is to be made of a sight draft, the papers must strictly comply with the conditions set forth in the letter of credit or the agreement accompanying it, if there is one: Old Colony Trust Company v. Lawyers Title & Trust Co., 297 Fed. 152 (2d Circ. 1924); Banco Nacional Ultramarino v. First National 'Bank, 289 Fed. 169 (1st Circ. 1923); Lamborn v. Lake Shore Banking & Trust Co., 188 N. Y. S. 162; 35 Harvard Law Review 715, 730 (1922); Atty. Gen. v. Dakin, 18 Law Times Rep. 823.    Banks are liable for the unauthorized payment of drafts, but this liability is not unusual or extraordinary.    Where the question of strict compliance is one to be decided by bank officials, they are held to the duty of good faith in forming an honest judg-

ment as to whether the papers attached to a draft correspond to the letter of credit.  The integrity of foreign drafts or like bills of exchange accompanied by commercial bills of lading and other documents drawn against letters of credit, should not be embarrassed or made difficult through technical or inconsequential reasons raised against payment.  The holders of these drafts have the right to expect that, when drafts conform in all essential requirements to the letter of credit, they will be paid by the drawee bank.

Where the question is between the vendee of the merchandise consigned or party arranging for the letter of credit, and the drawee bank which has accepted a draft drawn under such a letter, we see no reason for relaxing the strictness of the rule above announced.  The drawee bank has no right, by precipitate payment, to impose conditions on a vendee not contained in the letter of credit or contract.  While, in determining strict compliance, they should not be visited with liability for a mistake in the judgment of the officers honestly made, they should not escape responsibility where, from an examination of the papers, it is apparent they do not conform to the letter of credit.  The bank has a discretionary power of acceptance, but this discretion must not be abused.  The parties to the contract have the right to stipulate the conditions under which drafts or like bills of exchange, drawn against letters of credit, may be honored.  Persons dealing in commerce should know that these conditions must be complied with, and what might not appear to be material variations may have been deemed very important by the parties, and hence incorporated in the letter of credit or contract.  Such conditions must be given effect, and banks disregarding them by payment do so at their peril: Pan-American Bank & Trust Co. v. Nat. City Bank, 6 Fed. (2d) 762 (2d C. C. A.) ; Laudisi v. American Exchange Nat. Bank, 239 N. Y. 234, 146 N. E. 347.

It has been suggested by way of dicta in a few cases that if there has been a tender of goods called for by the contract between vendor and vendee, a bank which has accepted a draft made thereon can recover in a suit against the purchaser even though there was a variance between the description of the goods and the letter of credit and in the documents accompanying the draft: Bank of Montreal v. Recknagel, 109 N. Y. 482, 17 N. E. 217; Lamborn v. Lake Shore Banking & Trust Co., supra; National City Bank v. Seattle National Bank, 121 Wash. 476, 209 Pacific 705. This doctrine would set up the performance of the contract between the customer of the bank and a third party as a testing of the performance of the contract between the customer and the bank: Laudisi v. American Exchange National Bank, supra. It further depends upon facts not ascertained until after the bill has been accepted or rejected and is thus opposed to the basic principles universally laid down in transactions of this nature.

It has been held that in construing terms of letters of credit, they are subject to the same rules of construction as ordinary commercial contracts (International Banking Corp. v. Irving National Bank, 283 Fed. 103; Laudisi v. American Exchange National Bank, supra), and under certain circumstances parol evidence may be introduced to show a special trade meaning or custom. We need not discuss the cases where such evidence has been admitted in an effort to impose liability on the drawee for refusing to accept a draft. See Old Colony Trust Co. v. Lawyers Title & Trust Co., supra; O'Meara Co. v. National Bank, 239 N. Y. 386, 146 N. E. 636; International Banking Corp. v. Irving Nat. Bank, 283 Fed. 103 (2d Circ. 1922); Pan-American Bank & Trust Co. v. Nat. City Bank, supra, 768; Vietor v. National City Bank of New York, 193 N. Y. S. 868, 878, affirmed in 237 N. Y. 538. Our conclusions, however, make the consideration of parol evidence unnecessary even if we were disposed to admit it in a proper case.

Tested by the foregoing principles, should the bank have refused payment of the draft because of the notations on the bill of lading?  As stated in the review of facts, the bill of lading was charged as not being "clean" or "customary" because of the four notations.  The letter of credit did not require a "clean" bill of lading under the strict interpretation that term has sometimes been given.  No statute has been referred to regulating the form of a foreign bill of lading in the light of the objection, and it is assumed by the parties that the printed bill is the customary one.  Whether or not it is so "unclean" as to stop payment of the draft, because of these notations, must depend entirely on their effect when construed with the printed part.  The purchaser had a right to expect a bill conforming to the customary one, and these notations would add materially to the vendee's burden if it were not for the fact that they are substantially reiterations of what is contained in the printed part.  Such a bill may not be strictly regarded as a "clean" bill, because the writing challenges the immediate attention of the consignee, though imposing no additional responsibility, nor in any wise limiting the obligation of the consignor or carrier.  We find no reason, and none has been offered, for holding a writing that does not change the contractual obligations of the parties and adds nothing to the printed matter should defeat payment merely because it is a writing on the bill.  As we view the testimony of Zeller, it does not conflict with our deductions.  Banks are in duty bound to examine all the papers for discrepancies, and they are not required to look at any other documents than those specified in the letter of credit to determine whether there has been a compliance therewith: Bank of Taiwan v. Union National Bank of Phila., 1 Fed. (2d) 65 (3d C. C. A.); Pan-American Bank & Trust Co. v. National City Bank, supra.  It is urged the jury should have determined from the evidence whether, under the custom of the trade, the shipping documents were correct and in

accordance with the provisions of the letter of credit. The question which bank officials must decide when a draft is presented, is whether, from an inspection of the papers, they come within the letter of credit. It did not require the aid of parol evidence to determine this fact, where, as here, their language was clear and unambiguous and the deduction to be drawn free from doubt.

A more serious question arises when considering the effect of these words in the printed part of the bill of lading stating the sugar was received by the agents of the steamship company "to be transported by the steamer Arcturus or any other steamer," as being at variance with the letter of credit and agreement. The letter specifies "shipments during July 1920; ......the shipments must be completed and drafts drawn on or before August 15, 1920." This bill, it is argued, should have shown "shipment in July," a condition to be strictly complied with because of the fluctuations in the price of sugar. Appellants say the bill of lading is one commonly known as a "to be transported bill" and not a "received on board bill," the latter showing the goods to be actually on board the vessel.

We need not discuss the effect of the earlier cases where the term shipment has been construed. In recent decisions it has been given a broader meaning: Marlborough Hill v. Cowan & Sons, L. R. (1921) 1 App. Cas. 444; Vietor v. National City Bank of New York, supra. Nor need we consider again the rule announced in National City Bank v. Seattle National Bank, supra, and the Recknagle Case, which we have already discussed. Our consideration is limited to the construction of the letter of credit.

The draft, accompanied by the bill and other documents, arrived in this country sometime in September and were formally presented to the drawee on the 28th of September. The sugar reached New York on October 2d. The letter and contract required shipment on or before August 15th, but did not require an "on board".

bill of lading.  Shipment was to be a fact; it nowhere appears in the bill of lading that the shipment had been actually made or the merchandise was on board the vessel.  The bill of lading named the vessel or some other vessel of the shipping agents.  If the bill of lading had been the only document accompanying the draft, the bank officers, who were to examine only the papers before them, when the draft was presented, with the sugar not in port, would place the bank in a serious position by payment.  But some of the documents accompanying the bill of lading did state sufficient to show shipment as a fact.  The sellers' declaration, being a part of the documents, speaks of the "shipment" covered by the invoice as being "exported from Pasocroean," and the contracts of insurance, likewise a part of the same documents, characterize the sugar as being "in the ship or vessel called Arcturus."  With this information, the bank could very properly regard the sugar as on board the vessel.  This would justify the conclusion by the bank that the goods sold were "shipped" within the letter of credit.

Moreover, appellant did not assign the foregoing reason to the bank when the stop-payment order was given.  Only the notations on the bill and another very general reason were given as objections.  In matters of this kind, where the customer who secures the letter of credit wishes the bank to refuse to honor a draft, a matter solely for their determination, and gives reasons therefor, all should be stated.  Good faith requires it.  If the customer was not satisfied with the bill of lading because of a lack of clear proof of "shipment," it should have specified its objection: Littlejohn v. Shaw, 159 N. Y. 188, 53 N. E. 810; Honesdale Ice Co. v. Lake Lodore Improvement Co., 232 Pa. 293; International Banking Corp. v. Irving National Bank, 274 Fed. 122; Railway Company v. McCarthy, 96 U. S. 258, 267, 268; Dyer v. Insurance Company, 103 Iowa 524, 72 N. W. 681.  In general as stated above if the bill of lading was at vari-

ance with the letter of credit and so appeared on its face the bank would not be relieved of responsibility to see that the letter of credit was complied with.  This responsibility rests on the bank, apart from notice.  Where, however, the buyer, interested in the faithful execution of the contract, undertakes to assume the bank's responsibility by directing nonpayment and calls attention to defects, of which he has knowledge or the means of obtaining it, natural justice and equity require that he should be held to the specifications wherein he claims the instrument is faulty.  This is on the principle of estoppel.  As stated by Mr. Justice Schaffer in Bulliet, Trustee, v. Allegheny Trust Company, 284 Pa. 561, " 'Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and different consideration.  He is not permitted thus to mend his hold.  He is estopped from doing it by a settled principle of law': Honesdale Ice Co. v. Lake Lodore Improvement Co., 232 Pa. 293, 300.  The rule is founded on equitable estoppel: Second Nat. Bank of Allegheny v. Lash Corp., 299 Fed. 371 (C. C. A. 3d Cir. 1924).  Not having raised the question before, when, if there had been any substance in the objection......plaintiff might have corrected any error, defendant is estopped from interposing the defense now after suit is brought."

The application for the letter of credit, the contract between the parties, authorized the bank to accept drafts, if the "documents appear to be correct on their face or unimpeachable in their discretion, even if the documents should in fact prove to be incorrect, defective or forged." It is possible that this language gave to the drawee a wider latitude than they would ordinarily have.  Discretion involves the exercise of independent judgment or the power of the officers of the bank to act without control, but it does not include an arbitrary or capricious judgment or an abuse of power.  This stipulation,

that their discretion would alone determine whether the documents were correct or unimpeachable, would not warrant the bank in accepting a draft where the documents showed on their face they were not in conformity to the letter, including the contract. The latter might fix the price of sugar at ten cents a pound, while the bill of lading might double that figure. To accept a draft under such circumstances would be a manifest abuse of a discretionary power; no such facts are shown in this case.

It is urged that good faith was not exercised in accepting the draft, as it was not paid until six weeks after its first receipt. The reason for this delay will be discussed later; but even if the drawee bank ultimately concluded to pay the draft because, as is stated, appellants could not furnish bond, it is uncontradicted that, prior to that time, the bank recognized the validity of the documents, and must have concluded it would not further jeopardize commercial relations with foreign institutions by withholding payment of a perfectly valid instrument. The question of good faith cannot fairly be raised in this case, at least, by appellants. The bank showed the latter every consideration possible consistent with good banking practice.

Relative to the damages for delay in making payment from the time the draft was presented until paid, during which time the price of sugar declined rapidly, it is important to note that Camp, who represented all the plaintiffs, notified the bank on September 23d, not to pay. This was followed by a similar notice on September 29th, followed by another on October 5th; this latter notice provided that the bank should "refuse and continue to refuse" to pay, and a promise that if the matter was not settled in thirty days, appellants would endeavor to give a bond. The drawee bank for a time acquiesced in appellants' view as to the validity of the draft; it waited the thirty days at appellants' express request. No bond being produced, appellee waited a second presentation of the draft. This was made November

19th.   Whatever the delay, either before or after the thirty days, it was the direct result of appellants' continued and persistent efforts to secure nonpayment of the draft.   Camp sold the sugar and applied the proceeds in reduction of damages.   Under all these circumstances we cannot hold the bank liable for delay when it did just what appellants asked it to do.

Some question has been raised that the notations were a modified exemption from liability of a carrier in violation of the law.   But in Knott v. Botany Mills, 179 U. S. 69, it was held that stipulations relieving a carrier from liability for loss arising from negligence in loading or stowage of a cargo, shall not only be unlawful but shall be null and void.   The act of Congress it would seem controls such stipulations, but we do not regard them as being sufficient to create the conditions claimed by appellant.

The judgment of the court below is affirmed.