Gessler et al. *v.* Foote et al., Appellants.

Argued October 19, 1933.

Before KELLER, CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*David F. Maxwell,* and with him *Edmonds, Obermayer & Rebmann,* for appellants.

*Clarence G. Myers,* and with him *Duane, Morris & Heckscher,* for appellees.

OPINION BY CUNNINGHAM, J., February 1, 1934:

The action below was assumpsit to recover a balance of $1,735 alleged to be due upon a contract to build

a cemetery vault. The defendant and one of the members of the plaintiff partnership died prior to trial and their personal representatives were substituted. A verdict was returned in favor of the plaintiffs for the amount of their claim; defendants' motions for judgment n. o. v. and for a new trial were dismissed and they have appealed from the judgment upon the verdict.

The terms of the contract, as originally made, appear from the following letter:

"July 12, 1927.

Mr. Gilbert F. Foote, Sr.,
1530 Land Title Building,
Phila., Pa.

My dear Mr. Foote:

We wish to thank you for your order given to Mr. John M. Gessler, Jr., yesterday for one six crypt underground vault and granite cover, complete in its entirety, and which is to cost the sum of $3,620 payable upon the satisfactory completion of the work.

It is understood that the tablets to crypt, lining of the ends of chamber and the lining of the neck to vault, will be furnished from the best selected Tennessee marble. The shelves of crypts and the uprights thereto will be made of the best selected Ohio bluestone. The vault in itself will be constructed by the West Laurel Hill Cemetery and will be done in the most modern and approved method, using 13″ hard red brick walls; reinforced concrete roof and neck; and a concrete floor with French drain built therein. The floor will be covered with the Ceramic Art Tile flooring. Each tablet to crypt will be equipped with two standard bronze rosettes, which would be removed and replaced by bronze handles at such time that it would be necessary to remove a tablet and replaced thereafter.

The cover of vault will be cut out of the best selected

light Barre granite, the base and top piece to be finish
cut throughout.

We assure you that this order will receive our care-
ful and courteous attention and that this office will be
pleased to cooperate with you in every way.

Very truly yours,

John M. Gessler's Sons,

JR:JJR                   Per                   "

Subsequently, the original defendant directed plain-
tiffs to change the vault cover so that instead of being
made of solid granite it should contain two inserts
of glass, about six feet long and eighteen inches wide,
surrounded by a bronze frame. He agreed to pay $615
additional for this change. The vault was finally com-
pleted, with the substituted cover in place, in March,
1928, and the body of Mr. Foote's wife was interred
therein the following month. During the same year,
he paid $2,500 on account, but refused to pay more,
assigning as his reason that green and yellow stains
or streaks had appeared on the interior sides of the
vault. Plaintiffs explained that this condition re-
sulted from condensation which took place upon the
under side of the glass cover, and was unavoidable
where that method of construction was used. Several
efforts were made to wash off the stains, and at Mr.
Foote's request a groove was cut on the under side
of the cover to carry off the moisture which collected
there. The condition, however, was not fully reme-
died, and upon Foote's refusal to settle for the bal-
ance, plaintiffs brought suit in September, 1930. An
affidavit of defense was filed, in which it was denied
that the vault had been constructed in accordance with
the terms of the contract. The specific grounds enu-
merated in support of that averment were that the
plaintiffs had:

"(a) Failed to use the best selected Tennessee
marble in the construction of the said vault but on the

contrary used marble of an inferior quality with the result that within the period of approximately a week after plaintiffs claimed to have completed the construction of the vault, green and yellow stains appeared thereon, which the plaintiffs have been unable to remove permanently although they made numerous attempts so to do.

"(b) Failed to use the best selected light Barre granite but on the contrary used granite of an inferior quality with the result that green stains appeared thereon shortly after the installation was alleged to have been completed and have remained despite repeated efforts of the plaintiffs to remove the same.

"Defendant avers that the said stains of green and yellow in the marble and granite have completely ruined the appearance of the vault.

"(c) Constructed the said vault in such an unworkmanlike manner that the outside casing has become cracked and broken so as to permit surface drainage to seep through the cracks into the catacombs, causing considerable damage to the vault and its contents.

"(d) Constructed the bronze frame in such a negligent and unworkmanlike manner that it fails to fit tightly into the granite sides, thus permitting water to leak through into the crypt.

"(e) Failed to use bronze of first class quality in the construction of the bronze frame."

In conclusion, defendant cited the provision of the contract that payment was to be made "upon the satisfactory completion of the work," and averred that the vault was not satisfactory and had not been accepted by him for the reasons above set forth.

At the trial, the averments of the affidavit of defense were completely abandoned, and it was admitted that the vault was constructed in exact accordance with the terms of the contract; that the materials were of the

kind specified; and that there were no leaks or cracks. A different issue of fact was then raised by an amendment to the affidavit of defense averring, in substance, that the cover of the vault was constructed in such an unworkmanlike manner that the vents on the sides did not provide sufficient ventilation to prevent the process of condensation of the moisture within the vault from depositing discoloring salt solutions upon the granite and marble interior, causing green and yellow stains to appear upon the walls and floor of the vault. The case was tried upon this issue, and the jury, decided it in favor of the plaintiffs.

Two propositions are presented by appellants in support of this appeal. The first is that they are entitled to judgment upon the whole record because the vault was to be constructed to the satisfaction of the original defendant, and a complete defense was established by their proof that he was, in fact, dissatisfied because of the stains upon the interior of the vault. In support of this contention, appellants cite the line of cases headed by Singerly v. Thayer, 108 Pa. 291, 2 A. 230, and Adams Radiator and Boiler Works v. Schnader, 155 Pa. 394, 26 A. 745, which hold generally that where construction and operation are to be to the "satisfaction" of the purchaser, proof of dissatisfaction on the part of the latter is a sufficient defense, unless such dissatisfaction is capricious. Plaintiffs reply that these cases are not relevant; that the doctrine of substantial performance, as set forth in Standard Construction Co. v. Quaker City Cracker Co., 73 Pa. Superior Ct. 402, should be followed; and that, in any event, there was evidence from which the jury could reasonably find that defendant's alleged dissatisfaction was capricious.

We think, however, it is not necessary to determine into which category the present case falls. In our view, defendant limited himself, for the purposes of

this suit, to the grounds for dissatisfaction which he deliberately set forth in his affidavit of defense. Even if we assume that the appearance of the stains might have furnished a basis for a bona fide objection to payment of the balance due, the case was not defended on that theory. On the contrary, defendant went much further and specifically charged that plaintiffs had failed to use the best selected marble, granite and bronze; had allowed the outside casing to become cracked and broken; had failed to fit the bronze frame tightly into the granite sides; and, in general, had not performed their part of the contract. These alleged substitutions and deficiencies in construction were the avowed causes for his dissatisfaction, and it would be but elementary justice to require his representatives to adhere to the reasons assigned. The Supreme Court, as well as this court, has held repeatedly that when a party has assigned specific reasons for his conduct, he cannot, after litigation has begun, shift his ground and put his conduct upon other and different considerations. See Camp et al. v. Corn Exchange National Bank, 285 Pa. 337, 347-8, 132 A. 189. If such were not the rule, no plaintiff could properly prepare his case; he could not know what defense to expect at the trial. Since it was expressly conceded on the record that these averments of the affidavit of defense were entirely without foundation, the alleged dissatisfaction of the defendant, avowedly based upon them, should disappear from the case along with the averments.

In any event, the issue was tried primarily upon the substituted theory that plaintiffs had not supplied sufficient ventilation for the vault, with the result that the temperature inside did not correspond to the temperature outside, thereby causing the condensation which, in turn, was the cause of the streaks and stains. It is upon this branch of the case that appel-

lants base their argument for a new trial. They contend that the charge of the learned trial judge, FINLETTER, P. J., so unfairly stated the testimony of the experts relative to the proper mode of construction as to amount to reversible error.

Upon this subject, he charged:

"It appears, according to the testimony of somebody in the case, that there are two schools of thought about the way of avoiding necessary condensation when people put glass roofs on their crypts. One of them is to have little ventilation, and the other is to have a lot of ventilation. There were examples of crypts built according to both of these schemes in evidence before you, and of these eight or ten referred to were of the small ventilation theory, and one had only three openings. In fact the Gesslers take the ground that no openings at all are better for the purpose of ventilation, because the openings in these crypts are not for ventilation but to put a lever in to lift off the top when interment came along. But that was the extreme end of that school of thought, no ventilation at all. And the other is to have a large opening such as is built in the end of the Heist crypt. That is open to the objection, according to the little ventilation school, that a driving rain will drive in and more water will get in with a driving rain and stay in the crypt than would be made from the condensation of the ordinary moisture in the atmosphere, even in this room. That is the testimony before you. There are these two schools of thought. With the experts disagreeing upon that it is pretty difficult to charge that workmanship is bad workmanship if he adopts one of the two schools of thought on this subject, and yet that is what is being done in this case. The defense says they ought to have adopted the other one on the point of their ventilation theory, and yet the other school in the trade on the subject of ventilation say that if you

had done that you would not have produced this bad result.

"I leave that question to you to say whether it is bad workmanship to choose between two well-recognized methods of doing a job, because that is what this amounts to. If it is then the Gesslers must suffer and not be paid for what they have done."

The following extract from the opinion supporting the denial of defendants' motions adequately summarizes the evidence upon the subject:

"Expert testimony was taken, from which it appears that there are two theories in the trade, about avoiding condensation. They really differ very little. Some experts contend for larger ventilating holes than the others. The latter prefer smaller holes with 'baffle plates' to help keep out the rain, and object to the larger holes without the baffle plates, because, while the increased ventilation is beneficial, the benefit is lost in the first rainstorm. The plaintiffs had adopted the smaller holes with baffle plates.

"The net result of the testimony was that complete absence of condensation cannot be obtained.

"Defendants called a Mr. Finney, who testified as follows: 'In my opinion there is a lack of ventilation in the vault. Q. Do you think it could be corrected? A. I am inclined to believe it could. Q. What would you suggest?' A. The only thing I could suggest would be try a greater amount of ventilation and note the results.' He said that larger holes or a ventilating frame could be put in. But this he said would let in the rain.

"Dr. Lukens also thought that larger ventilating holes would carry off the moisture. He said nothing about their admitting rain. He thought the 'baffle plates' put in by plaintiffs behind the holes while they kept the rain out diminished the quantity of air admitted. Dr. Lukens said he did not claim to be an expert in construction of cemetery vaults.

"For the plaintiffs Mr. Ward, the assistant superintendent of, and for thirty years connected with, the Laurel Hill Cemetery, was called, and testified that ventilation had not solved the problem of condensation in vaults and mausoleums. He was asked: 'Q. Is condensation to be expected in a vault? A. In every vault that is built, both in mausoleums and underground vaults. ...... Q. Has ventilation solved the problem of condensation? A. No, it has not. On Friday after I got the subpoena from the other side, I visited all the underground vaults in the cemetery, and every one was sweating at that time, eighteen of them with glass tops were sweating and had condensation ...... Q. You have not any vaults free from condensation? A. No, or mausoleums. Q. Do you know of any vault free from condensation? A. I do not.'

"Hector Goslin, for the plaintiffs, testified that he had visited almost all the vaults in Laurel Hill, and all showed condensation. It could not be avoided.

"It appeared in the testimony that ventilating holes of various sizes are shown in the vaults, and that there is really no rule upon the subject. But if there is any practice that is recognized as a proper one in the trade, the jury has found that the plan adopted by the plaintiffs is a proper one."

Upon consideration of all the evidence, it is our opinion that the charge was not misleading. Not only was the question of ventilation an afterthought in this case, but the evidence convinces us that, as the trial judge states, complete absence of condensation cannot be obtained, and that there is no generally approved or standard method of ventilation. We think there was ample justification, in appellants' abandonment of their testator's charges of substitution of inferior materials and defective construction of the outside casing and in the testimony, for the comments concerning which complaint is now made.

Moreover, the evidence clearly discloses that when Mr. Foote directed plaintiffs in a letter dated October 6, 1927, "to change the design" of the top cover "to a cover with bronze frame and glass", he was warned by them of the result which ensued.

The jurors were clearly instructed that the issue finally submitted to them, under the statement, the affidavit as amended, and the evidence, was the "alleged bad workmanship" with respect to provisions for proper ventilation.

Upon that controlling issue, the trial judge said: "Coming back to that subject alone, where it is not complicated by the other subject, and that is the allegation that the structure was not constructed in a workmanlike way, that Gesslers, as experienced builders of mausoleums and crypts do not know their business, and have failed to ventilate this in the way the trade, profession or science recognizes as a proper way of building this crypt. If they did not do that, if they built the vault in an unworkmanlike way, for the reason specified, a lack of ventilation, or diminished ventilation, it would operate as a defense in this case."

An examination of this record has not convinced us that any of the assignments of error should be sustained.

Judgment affirmed.