## NEWSPAPER READERS SERVICE, Inc. v. CANONSBURG POTTERY CO.
### (two cases).
### Nos. 9853, 9876.

United States Court of Appeals
Third Circuit.

Argued May 20, 1949.

Decided Sept. 20, 1949.

Vincent M. Casey, Pittsburgh, Pa. (Charles J. Margiotti, Margiotti & Casey, Pittsburgh, Pa., on the brief), for appellant.

William G. Heiner, Pittsburgh, Pa. (David B. Campbell, Canonsburg, Pa., on the brief), for appellee.

Before O'CONNELL and KALODNER, Circuit Judges, and LEAHY, District Judge.

KALODNER, Circuit Judge.

This action was instituted to recover damages for alleged breach of a written agreement, dated August 6, 1942, entered into by the defendant, a manufacturer of pottery, and the plaintiff's assignor, S. R. Taylor. The agreement required the defendant to supply Taylor with "two car-

loads of dinnerware per week of sample patterns * * * Patterns & Packaging and shipments as selected" for a minimum period of one year. It quoted prices for six different sets of dinnerware, each comprised of 108 pieces, and for service plates, with packaging charges additional. Although the complaint was first dismissed in the court below, D.C., 52 F.Supp. 341, we held that there existed a binding contract between the defendant and Taylor, and that the latter had made an effective assignment to the plaintiff; accordingly, we required reinstatement of the complaint: 3 Cir., 1945, 146 F.2d 963.

Upon remand to the District Court, the cause was referred to a Special Master, who determined that the defendant had refused to deliver any dinnerware to the plaintiff as required by the contract, but that the plaintiff should recover only a nominal sum since the damages it showed were too remote to be deemed a loss directly and naturally resulting in the ordinary course of events from the breach.

From the order of the District Court adopting the Special Master's report and overruling the objections thereto, both sides have appealed. The defendant attacks the conclusion that it failed in performance of the contract, and the plaintiff asserts that it is entitled to substantial compensation for the default as found by the Special Master. These are the questions we must resolve.

Preliminarily, we note that an understanding of the controversy requires a definition of two methods of marketing dinnerware: (1) through newspaper premium campaigns and (2) through credit jewelers. The evidence and the findings of the Special Master disclose substantial differences between the two methods. In marketing through newspaper premium campaigns, the dinnerware is advertised on a large scale and the advertisement carries a coupon to be clipped by the reader. At any one of several depots established for the purpose, the reader may, with the coupon and a small sum of money, obtain a prescribed unit of dinnerware, such as a cup and saucer. Thus, over a period of weeks,

sometimes as many as forty, he may accumulate a complete 108-piece set. In marketing through credit jewelers, the purchaser may obtain a complete set of dinnerware on extended credit terms. To the manufacturer of the dinnerware, the method of marketing is reflected in his production. If the credit jewelry method is used, he must make complete 108-piece sets at any given time; if the newspaper premium method is used, he must produce and ship each week the pieces or units of a set in accordance with the campaign distribution schedule, completing the manufacture of a 108-piece set in about the same number of weeks as the campaign lasts.

With this background, we take up the issue, whether the contract was breached by the defendant. The findings of the Special Master may be summarized as follows:

Plaintiff's assignor, Taylor, was engaged in the business of selling dinnerware sets to credit jewelers, furnishing them with both the advertising promotion and the merchandise. Prior to August 6, 1942, he was also preparing himself to enter the newspaper premium business and, in July, 1942, he contacted the defendant. At this time, the defendant was in need of business and could accommodate one large customer. However, it was still making shipments, under an oral understanding in continuation of a written contract with National Unit Distributors, a concern engaged in the newspaper premium business. That contract [1] contained a provision that the defendant should not sell its dinnerware to any other concern in the same field. In addition, the defendant could not satisfy more than one customer in the newspaper premium business without unbalancing its production and rendering itself unable to serve its other customers for undivided sets.

At a meeting in Pittsburgh, Pennsylvania, on July 27, 1942, Taylor told the defendant's president, W. C. George, that he wished to buy dinnerware for the newspaper premium business, knowing that the defendant was already supplying National Unit Distributors. George told Taylor of his arrangement with that concern, and

---

I. The contract was renewed by the defendant on August 18, 1942.

said that he could not take more premium business, but that he would welcome credit jewelry business. Taylor stated that he could give the defendant all the credit jewelry business it wanted. Taylor, however, was uncertain as to how he would promote the credit jewelry sales.

On August 6, 1942, Taylor and George met again, in Boston, Massachusetts, and it was then that they entered in to the contract in dispute; George personally submitted to Taylor a written offer, which they agreed upon, and on the same day Taylor wrote a formal letter of acceptance addressed to George at the defendant's office in Pennsylvania.[2] At this meeting, the conversation related solely to the credit jewelry business, Taylor stating that he was well acquainted with credit jewelers all over the country; that he could do a big business; that he planned to market the merchandise through credit jewelers using a "unit packaging" system whereby complete sets were to be packaged in units and shipped to warehouses. At Taylor's suggestion, the defendant did, within several days after the meeting, devise a method of packaging complete sets in five units, and ordered from a paper box manufacturer sample cartons for that purpose.

Subsequently, by letter dated September 1, 1942, Taylor, "in line with our contract", definitely selected two patterns of dinnerware for immediate use, and requested that an order be entered for 2,000 sets of one of the patterns, "packing and shipping to be as per list and schedule attached in unit form". The shipping schedule, identified in the proceedings beow as "Exhibit G-1", called for 2,000 sets of dinnerware to be packed as "units" and to be shipped over a period of forty-one weeks, defendant to manufacture one unit each week, and to make shipments approximately every fourth week. But as the schedule was devised, the defendant was required to manufacture a single part of a set each week, such as a cup and saucer combination, an eight inch plate, or a soup plate; thus, at the end of forty-one weeks, it would have made the 2,000 sets complete. Moreover, the total order would have consituted approximately three carloads, or a weekly order of about one-tenth of a car.

Upon receipt of this schedule, George immediately realized that it was for the newspaper premium business. At a meeting in Pittsburgh, Pennsylvania, on September 8, 1942,[3] he told Taylor that it was plain to anyone that the shipping schedule was for newspaper business and that he would not have it; that if Taylor engaged in the credit jewelry business he could have the merchandise, but if he was going to use it for the newspaper premium business he could not. He also told Taylor that the defendant's contract with National Unit Distributors prevented it from doing newspaper premium business with any other concern. Taylor presented George with a proposed contract between the plaintiff and the defendant assuring the New York Daily Mirror of the existence of a contract pursuant to which the defendant would supply the plaintiff with dinnerware for a newspaper premium campaign. George refused to sign. Taylor then wrote at the foot of the proposed agreement that it was to be operative at once if it did not conflict with the defendant's contract with National Unit Distributors; and that if legal opinion indicated that this contract prevented the defendant from shipping dinnerware at once to the plaintiff, then the defendant would sell and ship to the plaintiff exclusively in the newspaper promotion field commencing at the expiration of National Unit Distributor's contract in about nineteen weeks. George refused to sign the agreement as amended.

2. We have already held in this case, 146 F.2d at page 965, that the law of Massachusetts governs the interpretation of the contract. It may be noted, however, that the laws of Pennsylvania and Massachusetts are in substantial agreement on the issues herein discussed.
3. The Special Master did not decide whether the schedule had been included in Taylor's letter of September 1, 1942, or had been handed to George at the meeting on September 8, 1942. Defendant's Exhibit 10 is a letter from Taylor to George, dated September 2, 1942, stating that Taylor had an order ready, but would "bring it personally" instead of mailing it.

In a letter dated September 14, 1942, George reiterated his position that the agreement of August 6, 1942, was for a credit jewelry business. However, George indicated he might do business with Taylor if the merchandise were purchased through a named Boston credit jewelry company, thus giving the defendant an "out" under its contract with National Unit Distributors. On September 15, 1942, Taylor wrote that he had wired the defendant that he could furnish the "out", but on September 17, 1942, George again wrote Taylor stating that he had taken up the matter of premium business with the defendant's board of directors and it was their opinion that the defendant could not handle more premium business and produce it on time. The letter contained no refusal to comply with the contract on the ground that it was the defendant's understanding that Taylor was to market the dinnerware through credit jewelry outlets.

The Special Master refused the plaintiff's requested finding that George knew, from the size of the contract and the weekly shipments required, that it was for the newspaper premium business. He determined that Taylor had not used any artifice to procure the exclusion from the writing of August 6, 1942, of a provision against the use of the dinnerware for newspaper campaigns; but that Taylor did profess to have both the ability and desire to market the dinnerware through credit jewelers, which was either a promise or a misrepresentation of intention. Further, the Special Master found that the "Defendant never declined to ship individual service sets of dinnerware as set forth in the offer of August 6, 1942"; [4] that the "Defendant was ready and willing to ship complete dinner sets, packed as such * * * upon the basis of orders received therefor and at the rate of two carloads per week"; [5] and that the "Defendant could have sold dinnerware sets * * * under its offer, at the same time continuing its sales of unbalanced production to National Unit Distributors, Inc." [6]

In concluding that the defendant had breached its contract, the Special Master pointed out that it had refused delivery for reasons substantially as stated in George's letter of September 17, 1942. Although it was found that the plaintiff had never ordered, and the defendant had never refused to ship, complete dinner sets, and the plaintiff never gave a shipment order for two cars, or even one car, of dinnerware per week, [7] the Special Master decided that the defendant, not having originally based its refusal to deliver on those grounds, could not do so after the commencement of litigation.

In our view, the critical issue of the case is the subject matter of the contract: whether it was for the weekly delivery of complete sets of dinnerware, packaged as the plaintiff should dictate; or for the weekly delivery of selected units or pieces of dinnerware which over a period of time would constitute complete sets.

On this score, the Special Master made no clear-cut finding. Nevertheless, he has resolved the dominant question of credibility, and has made certain findings of fact which convince us that the contract required of the defendant the weekly shipment of complete sets, packaged according to the instructions of the plaintiff. Cf. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 394–395, 68 S.Ct. 525, 92 L.Ed. 746. Not merely did the conversation on August 6, 1942, relate solely to the marketing of dinnerware through credit jewelers, but George had already refused Taylor's offer to buy dinnerware for the newspaper premium business, and Taylor was fully aware of the defendant's arrangement with National Unit Distributors. Accordingly, it cannot be said that Taylor had any reasonable expectation of receiving from the defendant under the contract, dinnerware in the manner necessary for distribution through newspaper premium campaigns. Moreover, Taylor misrepresented his intention to George, and his suggestion for "unit packaging" related to the packaging of a complete set in a

---

4. Finding of Fact No. 43.
5. Finding of Fact No. 71.

6. Finding of Fact No. 72.
7. Finding of Fact No. 43.

manner inconsistent with the notion that the defendant would be required to manufacture weekly the separate items comprising a set. To permit the plaintiff now to seize upon the unqualified term "dinnerware" in the written contract and upon its contractual right to dictate the packaging, for the purpose of converting the contract to the use it seeks, would, in our opinion, produce the inequitable result of ascribing to the contracting parties an intent exclusively the secret of Taylor and contrary to their objective manifestations at the time the agreement was made. See Restatement, Contracts, Pa. and Mass. Annotations, Sections 230 and 235(d), and comment thereto. That the contract was for weekly shipments of sets is further indicated by the Special Master's findings that the defendant never declined to ship sets "as set forth in the offer of August 6, 1942," [8] and could have sold sets "under its offer".[9]

█ It follows upon what we have said that the shipping order contained in Exhibit G-1, as described above, was in substance different from the requirements of the contract, and substantially so; hence, it did not constitute an order under the contract which the defendant was obligated to fulfill. Although the Special Master did not thus characterize Exhibit G-1, he found as a fact that the defendant never received, and the plaintiff never issued, an order for complete sets of dinnerware to be delivered as such. And since the defendant never declined to ship sets and was ready and willing to do so, it was not in default. For, to secure to itself a right of action against the defendant, it was incumbent upon the plaintiff, first, to make a proper demand or offer of performance, which it did not do.[10]

█ The Special Master's conclusion that the defendant breached the contract by refusing to deliver *any* dinnerware to the plaintiff as required by the contract is inconsistent with the finding of fact that the defendant never declined to ship sets of dinnerware "as set forth in the offer of August 6, 1942". The Special Master, relying on Honesdale Ice Co. v. Lake Lodore Imp. Co., 1911 232 Pa. 293, 81 A. 306, limited the defendant's defense, as already stated, to the assertions contained in its letter of September 17, 1942. Insofar as Massachusetts would be concerned, this reliance is misplaced. Restatement, Contracts, Mass. Annotations, Section 304. Insofar as Pennsylvania is concerned, while the cases there, like the Honesdale case, frequently use broad language indicating that a defendant may not introduce a new defense after litigation is begun, nevertheless the principle of equitable estoppel is the foundation of the rule, as stated in the Restatement, Section 304. Thus, in Camp v. Corn Exchange National Bank, 1926, 285 Pa. 337, at page 348, 132 A. 189, at page 193, the Pennsylvania Supreme Court said, after citing the Honesdale decision: "The rule is founded on equitable estoppel. Second Nat. Bank of Allegheny v. Lash Corp., 3 Cir., 1924, 299 F. 371. Not having raised the question before, when, if there had been any substance in the objection, * * * plaintiff might have corrected any error, defendant is estopped from interposing the defense now after suit is brought."

To the same effect is Haney v. Hatfield, 1913, 241 Pa. 413, 416, 88 A. 680, 682, wherein the statement was quoted: "Thus, if he make specific objections to the tender, this is a waiver of all others that are of such nature that, if stated by him, they might have been obviated."

In any event, the letter of September 17, 1942, was a reply to the plaintiff's offer for newspaper premium business, which the defendant was entitled to treat as a new offer, and was not a rejection of the plaintiff's business under the contract. Indeed, the defendant, on September 8, 1942, did not simply refuse to ship dinnerware in accordance with Exhibit G-1, which would have been enough, but affirmatively stated to Taylor that merchandise was available to him for the credit jewelry business.

---

8. Finding of Fact No. 43.

9. Finding of Fact No. 72.

10. The Special Master found that on September 2, 1942, the defendant sent a telegram to Taylor requesting an order. Finding of Fact No. 39.

Accordingly, our conclusions are, on the specific findings of the Special Master, that the plaintiff's order for dinnerware was not an order under the contract of August 6, 1942, and that the defendant was not in default. There is no necessity, therefore, to consider the issue of damages raised by the plaintiff.

For the reasons stated, the judgment of the District Court will be reversed, and the cause remanded for proper action not inconsistent with this opinion.