**COURTAULDS NORTH AMERICA, INC., Plaintiff,**

v.

**NORTH CAROLINA NATIONAL BANK, a National Banking Association, Defendant.**

No. C-339-G-73.

United States District Court, M. D. North Carolina, Greensboro Division.

Jan. 7, 1975.

Welch Jordan and Lindsay R. Davis, Jr., of Jordan, Wright, Nichols, Caffrey & Hill, Greensboro, N. C., for plaintiff.

E. Osborne Ayscue, Jr., Robert B. Cordle, Charlotte, N. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HIRAM H. WARD, District Judge.

This action came on for hearing before the Court on August 23, 1974, on cross motions by the parties for summary judgment. The plaintiff, Courtaulds North America, Inc., (Courtaulds), is seeking damages in the amount of $67,346.77, plus interest, from the defendant, North Carolina National Bank (NCNB) for the defendant's failure to honor an irrevocable letter of credit issued by the defendant in favor of the plaintiff. Jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332.

The parties have stipulated all the material facts in this case, and they have also stipulated as to the authenticity of the various exhibits and documents before the Court. From the somewhat complex commercial transaction which underlies this lawsuit, one direct and pivotal legal question is presented for determination by the Court: Did the invoice, submitted by Courtaulds through its confirming bank to the defendant, conform with the requirements of the letter of credit?

After careful consideration of the facts, exhibits, briefs of counsel, and research into this specialized area of commercial law, it is concluded that the invoice submitted by the plaintiff did conform to the requirements of the defendant's letter of credit and, in any event, the defendant waived any objections to the form in which the invoice was submitted by the previous course of dealing between the parties. Therefore, a judgment will be entered for the plaintiff.

Based upon the record and the stipulation of the parties, the Court makes the following findings of fact.

### Findings of Fact

1. On March 21, 1973, the defendant NCNB at the request of and for the account of its customer Adastra Knitting Mills, Inc. (Adastra), issued its irrevocable letter of credit No. C–8312 in favor of the plaintiff Courtaulds.

2. Copies of the letter of credit, the amendments thereto, and all documents referred to herein have been stipulated into evidence by the parties.

3. The letter of credit provided that payments would be: "Available by your draft at sixty days' date for 100% of invoice value. Drafts to be dated same as Bills of Lading."

4. The letter of credit provided that the drafts would have to be accompanied by certain documents including a certificate stating the goods would be delivered to buyer's plant, an inland bill of lading, and a "Commercial invoice in triplicate stating that it covers 100,000 lbs. 100% Acrylic Yarn, Package Dyed at $1.35 per lb., FOB Buyers Plant, Greensboro, North Carolina Land Duty Paid."

5. The letter of credit further provided: "We hereby agree with the drawers, endorsers and bona fide holders of drafts drawn under and in compliance with the terms of this credit that such drafts will be duly honored on presentation to the drawee, if drawn and negotiated on or before June 15, 1973, at which date this credit expires."

6. The letter of credit further provided "Except as otherwise expressly stated herein, this credit is subject to the 'Uniform Customs and Practice for Documentary Credits (1962 revision), the International Chamber of Commerce, Brochure No. 222.'"

7. Partial shipments were permitted and various amendments extended the expiration date of the letter of credit to August 15, 1973.

8. During the period covered by the letter of credit, Courtaulds dispatched several shipments of Acrylic yarn to Adastra. The procedure for each shipment was substantially as follows:

(a) The letter of credit provides Courtaulds with the information concerning the quantity of yarn to be shipped.

(b) The Traffic Department, which keeps records of the yarn warehoused by Courtaulds, instructs a particular warehouse to release the required quantity of yarn for shipment to the buyer.

(c) The yarn is packaged in cartons.

(d) A moter carrier prepares a bill of lading under which it accepts possession of the goods for shipment.

(e) The bill of lading indicates, among other details, the quantity of the goods shipped by carton and weight.

(f) A packing list lists the individual weight of each carton and is referenced to the bill of lading.

(g) After the yarn is delivered to the carrier, the bill of lading and the packing lists are forwarded to Courtaulds.

(h) Upon receipt, Courtaulds feeds the information into its computer.

(i) The computer prints documents entitled "Invoices."

(j) The documents are delivered to Mr. Stanley J. Thurston's office where the certificate, credit memorandum and draft are prepared.

(k) A secretary adds to the "Invoice" with a typewriter any specialized legend or other required language. The "Invoice" and the corresponding packing list are then stapled together.

(l) All documents are clipped together into a package to be delivered to the Merchants National Bank of Mobile along with an instruction sheet.

(m) The Merchants National Bank of Mobile checks the documents, prepares a transmittal and forwards the documents to NCNB for acceptance.

(n) Upon receipt of the documents, NCNB notifies Courtaulds, through the Merchants National Bank of Mobile, that the draft has been accepted.

(o) Courtaulds closes its file on that particular shipment, and receives the payment for the shipment in due course.

9. On or about August 8, 1973, Courtaulds shipped the final shipment consisting of 483 cartons of yarn to Adastra from a bonded warehouse in Lincolnton, North Carolina, via a motor carrier, Custom Transport, Inc.

10. A bill of lading dated August 8, 1973, was prepared consigning the shipment to Adastra.

11. The bill of lading and the packing lists were forwarded from the warehouse to Courtaulds' office in Mobile, Alabama.

12. When Courtaulds received the bill of lading and packing lists, the required information was fed into the computer which printed documents entitled "Invoices," Nos. Y701, Y702, Y703 and Y704.

13. The documents were delivered to Mr. Thurston's office, where he prepared the certificate and credit memorandum required by the letter of credit.

14. Mr. Thurston stapled copies of the packing lists to each of the corresponding documents entitled "Invoice."

15. He prepared the draft and the instruction sheet for delivery to the Merchants National Bank of Mobile ("Merchants"). The draft was then endorsed to Merchants by W. Z. Chapman, Controller of Courtaulds.

16. With a gem clip, Mr. Thurston attached:

(a) The draft, with instruction sheet;

(b) The bill of lading;

(c) The certificate, in triplicate;

(d) The credit memorandum, in triplicate; and

(e) The invoices, in triplicate, with packing lists attached.

17. The package was delivered by a Courtaulds employee under the direction of Mr. Thurston to Merchants.

18. In the instruction sheet sent by Courtaulds to Merchants, the documents attached to it are listed as including "Commercial Invoice" and under a separate heading of "Other Documents" is typed: "Packing Lists." All transmittal letters from Courtaulds to Merchants made this separate listing.

19. Merchants prepared a transmittal sheet, endorsed the draft to NCNB and forwarded the package to NCNB on August 14, 1973.

20. NCNB received the draft in question with accompanying documents on August 16, 1973.

21. The documents and the draft were processed following NCNB's ordinary procedure, and NCNB discovered what it considered to be discrepancies in the documents and the draft.

22. On Monday, August 20, 1973, an NCNB employee telephoned NCNB's customer Adastra to see if it would be willing to waive the discrepancies and the expiration date and allow NCNB to accept the documents and the draft presented therewith.

23. The President of Adastra informed the employee of NCNB that Adastra would not waive any discrepancies and he had no authority to waive any discrepancies or any late date because Adastra Corporation had filed a Chapter X Bankruptcy Petition and a Federal Judge in Greensboro had appointed a Trustee.

24. On August 22, 1973, NCNB notified the Merchants National Bank of Mobile by telegram stating that the draft would not be paid because of discrepancies in that: "Invoice does not state 100% Acrylic Yarn as per l.c.—Draft not drawn as per terms of l.c. Date not same as Bill of Lading and not drawn 60 days date."

25. The draft states on its face that the amount of the draft is payable "60 days from B/L date 8/8/73."

26. The description of the goods in the documents entitled "Invoices" was "Imported Acrylic Yarn."

27. The packing lists attached to the documents entitled "Invoices" state on their faces: "Cartons marked:—100% Acrylic."

28. After Courtaulds received the telegram dated August 22, 1973, from NCNB, a set of documents entitled "Amended Invoices" was prepared under the supervision of Mr. Thurston which did include the legends required by the letter of credit. These documents were forwarded to Merchants for transmittal to NCNB.

29. On or about August 24, 1973, Merchants contacted Mr. Reiter and informed him that the documents entitled "Amended Invoices" had not been received. Mr. Thurston was not available at that time, so Mr. Reiter supervised the preparation of another set of documents entitled "Amended Invoices" which did include the aforesaid typed legends including the language "Imported 100% Acrylic Yarn" and mailed these documents to Merchants for transmittal to NCNB.

30. On August 27, 1973, NCNB received "Amended Invoices" with a letter of transmittal from Merchants which stated it was sending "amended invoices to replace the invoices" sent earlier.

31. The "Amended Invoices" were one page documents without any packing lists or other documents stapled or attached to them.

32. The "Amended Invoices" did have typed on them: "100% Acrylic Yarn."

33. NCNB then notified Courtaulds by telegram dated August 29, 1973, that the draft remained dishonored due to the expiration of the letter of credit by its own terms.

34. At the request of Courtaulds, all of the original documents were then returned by NCNB.

35. During the period covered by the letter of credit, several drafts were drawn upon the letter of credit.

36. All drafts were drawn payable sixty days from the date of bill of lading.

37. Some drafts were dated the same date as the bill of lading, and some drafts were dated the date the particular draft was actually drawn, with a specific notation that the draft was payable sixty days from bill of lading date:

(a) On May 30, 1973, a draft was drawn pursuant to the letter of credit, dated May 30, 1973, with the following notation: "Exchange for $33,822.-90 at 60 days from B/L date 5/17/73."

(b) On July 12, 1973, a draft was drawn dated July 12, 1973, with the following notation: "Exchange for $31,244.40 at 60 days from B/L date 6/29/73."

(c) On July 12, 1973, a draft was drawn dated July 12, 1973, with the following notation: "Exchange for $33,701.40 at 60 days from B/L date 7/2/73."

38. Each of the drafts so dated was paid by NCNB without protest to Courtaulds.

39. During the term of the letter of credit, a shipment was made to Adastra, evidenced by documents entitled "Invoices" Nos. Y610, Y611, Y612 and Y613.

40. The draft accompanying the documents entitled "Invoices," Nos. Y610, Y611, Y612 and Y613 was paid by NCNB despite the fact that there appears no legend on the face of the documents setting forth either "100% Acrylic Yarn" or "F.O.B. BUYER'S PLANT GREENSBORO, N. C. LAND DUTY PAID" or any other similar legend typed in after the computer print-out of the documents.

41. During the life of this particular letter of credit, Courtaulds transmitted to NCNB a large number of invoices. At least 15 of these invoices specified on their face that it was for a shipment of "100% Acrylic Yarn."

42. It is a standard practice and procedure of the banking industry and trade for a bank to attempt to obtain a waiver of discrepancies from its customer in a letter of credit transaction. This custom and practice was followed by NCNB in connection with the draft and documents received from Courtaulds.

43. Following this practice, NCNB had checked all previous discrepancies it discovered in Courtaulds' documents with its customer Adastra to see if Adastra would waive those discrepancies noted by NCNB. Except for the transaction in question, Adastra waived all discrepancies noted by NCNB.

44. It is not normal or customary for NCNB, nor is it the custom and practice in the banking trade, for a bank to notify a beneficiary or the presenter of the documents that there were any deficiencies in the draft or documents if they are waived by the customer.

45. NCNB did not notify Courtaulds of any discrepancies in any of the drafts or documents when the discrepancies were waived by Adastra, nor did NCNB notify Courtaulds that it was requesting waivers from Adastra.

46. In dealing with letters of credit, it is a custom and practice in the banking trade for a bank to only treat a document as an invoice which clearly is marked on its face as "Invoice."

47. In dealing with letters of credit, it is a custom and practice of the banking trade not to consider other documents that are not required under the terms of the letter of credit sent with a draft in determining the correctness of the description of the goods required to be in an invoice.

## Discussion

A commercial letter of credit is essentially a third party beneficiary contract by which a party wishing to transact business induces a bank to issue the letter to a third party. It is a contract between the procuring customer and the issuing bank for the benefit of the payee-beneficiary. In the ordinary letter of credit situation, at the request of one of its customers a bank issues directly to a third party a promise to pay a sum of money upon being furnished certain documents, thereby substituting the bank's credit for the buyer's credit in favor of the beneficiary. *See generally* Harvey Estes Construction Co. v. Dry Dock Savings Bank of New York, 381 F.Supp. 271 (W.D.Okla.1974). An issuer is obligated to honor a draft or demand for payment which complies with the terms of the letter of credit, but an issuer may require that specified documents be satisfactory to it. N.C.G.S. § 25–5–114(1).

The only issue presented by the facts of this case is whether the documents tendered by the beneficiary to the issuer were in conformity with the terms of the letter of credit. Specifically, documents entitled "Invoices" were prepared by the plaintiff, Courtaulds, along with a certificate and credit memorandum required by the letter of credit, and were sent with a draft in the amount of $67,346.77 to the confirming bank. The plaintiff stapled to each invoice a packing list prepared at the warehouse. The confirming bank endorsed the draft to NCNB and forwarded the documents to NCNB in due time.[1] The letter of credit required the commercial invoice to state that it covered

---

1. In the pleadings, the defendant raised the defense that the letter of credit had expired by its own terms before the defendant received the documentary demand for payment. It is clear that Courtaulds negotiated the draft within the meaning of N.C.G.S. 25–3–202(1) before the termination date of the letter of credit on August 15, 1973. (Finding of Fact No. 19). Additionally, the defendant admits the draft was negotiated before expiration of the letter of credit, such admission being found in the Defendant's Proposed Discussion and Conclusions of Law. However, the "amended invoices" prepared by the plaintiff and negotiated after the termination date of the letter of credit (See Findings of Fact Nos. 28–34) certainly would have no bearing on the outcome of this case. If an irregularity did exist in the documents, it would have to be corrected before the expiration date on the letter of credit in order for the bank to be liable. Ufitec, S. A. v. Trade Bank and Trust Co., 21 A.D.2d 187, 249 N.Y.S.2d 557 (1964).

"100% Acrylic Yarn" among other requirements. The first page of the invoice submitted by the plaintiff referred to "Imported Acrylic Yarn." To the documents entitled "Invoices," Courtaulds stapled copies of packing lists which did contain the reference to "100% Acrylic."

The plaintiff contends the stapled documents were integrated and should be considered as one complete document which supplied the required description of the letter of credit, thereby obligating NCNB to honor the documentary demand for payment. The defendant contends that the invoice submitted by the plaintiff was not in strict conformity with the requirements of the letter of credit and it had no obligation to examine the stapled documents affixed to the invoice to determine if they supplied the requisite description.

Under familiar principles of law governing the trial of diversity cases in federal court, the issue stated above must be resolved under the law of North Carolina inasmuch as that State was the situs of the contractual acts of the parties.

Counsel for both parties advise the Court that their research has been unable to produce any reported North Carolina cases dealing with letters of credit. There is a paucity of court decisions generally in this specialized area of commercial law, and existing *stare decisis* has been generated largely in the northeastern jurisdictions where international financing occurs with greater frequency. Furthermore, the lack of statutory and case law in this area has been attributed to a remarkably successful effort by international bankers to govern themselves by consensual regulation. Most of the commercial nations of the world have accepted a compilation of customs and practices in the letter of credit field, prepared by the International Chamber of Commerce, and known as the Uniform Customs and Practice for Documentary Credits, Brochure No. 222 (Uniform Customs). *See* Annot., 35 A.L.R.3d 1404, 1408 (1971). The parties to this action have contractually agreed to be governed by the Uniform Customs.

The Uniform Customs does not deal with the specific problem faced by the parties in this case. However, it does set forth several guiding principles which assist in analysis. One of those principles is that credits, by their nature, are separate transactions from the sales or other contracts on which they may be based and banks are in no way concerned with or bound by such contracts. Since a bank deals in instruments and not in goods, it is not concerned with the contract between the buyer and the seller, and it undertakes to honor drafts drawn in strict compliance with the terms of the letter of credit. Uniform Customs, General Provisions and Definitions (c). "Banks must examine all documents with reasonable care to ascertain that they appear on their face to be in accordance with the terms and conditions of the credit." Uniform Customs, Article 7. "If, upon receipt of the documents the issuing bank considers that they appear on their face not to be in accordance with the terms and conditions of the credit, that bank must determine, on the basis of the documents alone, whether to claim that payment, acceptance or negotiation was not effected in accordance with the terms and conditions of the credit." Uniform Customs, Article 8. "The description of the goods in the commercial invoice must correspond with the description in the credit. In the remaining documents the goods may be described in general terms." Uniform Customs, Article 30.

One thread which remains constant from the earliest through the most recent cases involving letters of credit is that a bank is interested only in the documents to be presented and, therefore, the essential requirements of a letter of credit must be strictly complied with by the party entitled to draw against the letter of credit. This means all required documents must be as stated in the letter. *See* Fidelity Bank v. Lutheran Mutual Life Insurance Co., 465 F.2d 211

(10th Cir. 1972); Sisalcords Do Brazil, LTD. v. Fiacao Brasileira De Sisal, S.A., 450 F.2d 419 (5th Cir. 1971); Venizelos S.A. v. Chase Manhattan Bank, 425 F.2d 461 (2d Cir. 1970); Banco Espanol de Credito v. State Street Bank & T. Co., 385 F.2d 230, 234 n.5 (1st Cir. 1967); Crocker First Nat. Bank v. De Sousa, 27 F.2d 462 (9th Cir. 1928).

■ The law of letters of credit has been further refined by adoption of Article 5 of the Uniform Commercial Code. N.C.G.S. § 25–5–109(2) states "An issuer must examine documents with care so as to ascertain that on their face they appear to comply with the terms of the credit . . . ." In other words, the legal standard which the issuer is required to meet in order to avoid liability is one requiring a careful examination of the documents to determine if they are regular on their face. 35 A.L.R.3d 1404, § 7 (1971). In the event the documents appear regular on their face and the documentary demand for payment complies with the terms of the credit, the issuer must honor the draft. N.C.G.S. § 25–5–114.

However, neither the doctrine of strict compliance outlined by the above-cited cases nor the statutory enactment of Article 5 of the Uniform Commercial Code resolves the issue presented by the facts of this case as to whether documents stapled together should be considered as one integrated writing. The drafters of Article 5 realized that questions such as this would arise and they made no attempt to codify rules as to whether documents in fact and in law do or do not comply with the terms of the credit. In a somewhat unique approach, the Official Comment recognized that the law concerning letters of credit was an evolving field and such questions were specifically left for future judicial adjudication, with the admonition to the courts to apply Section 1–102(1) to this area by following the canon of liberal interpretation to promote underlying purposes and policies. N.C.G.S. § 25–5–102, Official Comment 2.

■ The Court understands the purpose and policy of the Uniform Commercial Code to be the facilitation of business transactions between individuals, with the least amount of interference possible, with a view toward implementing the intentions of the parties. Furthermore, a fair and reasonable construction that will sustain an instrument will be preferred to one that will defeat it; if an agreement is fairly capable of a construction that will make it valid and enforceable, that construction will be given to it. Where a letter of credit is fairly susceptible of two constructions, one which makes it fair and customary and one which prudent men would naturally enter into, while the other makes it inequitable, the former interpretation must be preferred to the latter, and a construction rendering the contract possible of performance will be preferred to one which renders performance impossible or meaningless. And finally, a general rule of construction most important to the disposition of this case is that in construing letters of credit the same general principles which apply to other contracts in writing govern letters of credit. Venizelos, S.A. v. Chase Manhattan Bank, *supra*; Wichita Eagle & Beacon Publishing Co., Inc. v. Pacific National Bank of San Francisco, 343 F.Supp. 332 (N.D.Cal.1971); Dynamics Corp. of Amer. v. Citizens & Southern Nat. Bank, 356 F.Supp. 991 (N.D.Ga.1973); 6 Michie on Banks and Banking 372 (Perm.Ed.1952).

■ It is the law of North Carolina that two sheets attached together as parts of a single communication must be construed as one document. *See* Gurney Industries, Inc. v. St. Paul Fire & Marine Ins. Co., 467 F.2d 588 (4th Cir. 1972); Wiles v. Mullinax, 275 N.C. 473, 168 S.E.2d 366 (1969). Although neither of these cases nor any North Carolina cases which could be found applied the above-stated rule to letter of credit transactions, the requirement that general rules applicable to contracts in writing be applied to letters of credit mandate recognition of the rule in this case.

The plaintiff attached by staple to the paper writing labeled "Invoice" a second paper writing which was a packing list. The page labeled "Invoice" contained the description "Imported Acrylic Yarn" but did not state the percent called for by the letter of credit. However, the affixed packing list *did* state the required "100% Acrylic" and supplied the full description called for by the credit when read in conjunction with the first page entitled "Invoice." The stapled papers were regular on their face and they should have been regarded as one document. "Literal compliance with the terms of a letter of credit as to documents *accompanying the draft* is not required to authorize payment of the drafts thereunder. . . . And a bank is not justified in rejecting a draft under a letter of credit if all the accompanying documents, *read together,* answer the requirements of the letter." (Emphasis added). 6 Michie on Banks and Banking at 377 (Perm.Ed.1952).

In making such a ruling, it must be pointed out that this decision in no way impairs operation of the requirement that submitted documents must be in strict conformity with the description in the letter of credit before the issuer is obligated to pay. Additionally, the rule that stapled papers are generally to be regarded as one document is certainly limited by a rule of reasonableness and the affixing of many complex or lengthy pages of description to a documentary demand would not subject an issuer to scrutinize the entire mass in order to determine if the requirements of the credit had been met. However, the facts of this case do not introduce such complications. The affixed two pages are not lengthy and they are not complex. Simple inspection by the issuer would reveal compliance with the terms of the letter of credit and thereby obligate the bank to honor the draft.

The rule that pages physically attached by staple/are to be considered as one document when considering letter of credit transactions is a concept which naturally follows from the law governing written contracts generally and is not entirely without support in the decisional law relating to letters of credit in jurisdictions that have dealt with the question.

In Laudisi v. American Exchange Nat'l Bank, 239 N.Y. 234, 146 N.E. 347 (1924), the purchaser sued the bank which issued a letter of credit and paid a draft thereunder for a shipment of grapes claimed to be inferior. The letter of credit specified shipment of "Alicante Bouchez Grapes," and required invoice and bill of lading to accompany draft. The bill of lading attached to the draft described the shipment as grapes." The invoice, also attached to the draft, described the shipment fully in the terms of the letter of credit. The New York Court of Appeals sustained a demurrer and said:

> "Thus the two instruments together showed a shipment of the articles which plaintiff's contract of sale called for and which fully warranted the payment of the draft, but the plaintiff says that this is not sufficient. He argues that the bill of lading by itself should have shown a shipment of the particular kind of grapes called for by his contract and specified in the letter of credit, and that the defect in the description contained in it cannot be remedied by the invoice made out by the vendor in New York City. He cites no case which, in our opinion, sustains the contention, nor are we aware of any such one, and the allegations of the affidavits presented on the application for judgment do not sustain such contention." 146 N.E. at p. 348.

Talbot v. Bank of Hendersonville, Tenn.App., 495 S.W.2d 548, 554, 13 U.C. C.Rep.Serv. 310, 318 (1973).

In Banco Espanol de Creditor v. State Street Bank and T. Co., 385 F.2d 230 (1st Cir. 1967), a Spanish bank sued a domestic "issuer" bank because of the issuer's refusal to honor and pay two drafts drawn upon it under two irrevo-

cable letters of credit. The issue was whether the domestic bank, whose letter of credit called for the presentation of an inspection certificate by a named firm stipulating "that the goods are in conformity with the order," was justified in refusing to honor the drafts of the Spanish bank on the grounds that the inspection certificate did not meet the terms of the letter of credit. Some confusion occurred between the parties as to what was an "order" and what was a "stock sheet" resulting in the required inspection certificate stating that the "whole . . . [was] found conforming to the conditions estipulated [sic] on the Order-Stock-Sheets."

One of the questions which the Court of Appeals for the First Circuit addressed was whether the "order-stock-sheet" terminology was different from the "order" specifically called for by the letter of credit. The court recognized the necessity of strict construction of documents where financial transactions rest upon the accuracy of the documents rather than on the condition of goods they represent. However, the Court stated, "But we note some leaven in the loaf of strict construction. Not only does *haec verba* not control absolutely, [citation omitted], but some courts now cast their eyes on a wider scene than a single document. We are mindful, also, of the admonition of several legal scholars that the integrity of international transactions (i. e., rigid adherence to material matters) must somehow strike a balance with the requirement of their fluidity (i. e., a reasonable flexibility as to ancillary matters) if the objective of increased dealings to the mutual satisfaction of all interested parties is to be enhanced." 385 F.2d at 234. The court stated that under the circumstances there was no meaningful variance from the terms of the letter of credit by the use of the term "Order-Stock-Sheets" in the inspection certificate rather than the term "order." It was determined that former phraseology describing the document supplanted the latter and was of no consequence in the parties' dealings.

In similar fashion under the facts of the present case, the packing list supplemented and was in fact an integral part of the commercial invoice required by the letter of credit. In previous conduct, the parties had apparently treated the packing list as part of the invoice, since the defendant bank had made no previous claim of variance when the plaintiff submitted identical documentary papers. Earlier demands for payment were honored without protest to the plaintiff. In the *Banco Espanol de Credito* case the "orders" merged with and became a part of the "Order-Stock-Sheets" in dealings between the parties. In the present case, the packing list was affixed to the commercial invoice and became a part thereof.

As mentioned previously, where a letter of credit is substantially complied with every reasonable effort should be made by the courts to uphold its validity, particularly where the objections are technical in nature and made only in an effort by the issuer bank to escape from the legal effect of a business bargain. The courts frown upon mere technical defenses where in essence the contractual understanding between the parties has been met. *See* Bank of America Nat. T. & S. Ass'n v. Liberty Nat. B. & T. Co., 116 F.Supp. 233 (W.D.Okla.1953), aff'd, 218 F.2d 831 (10th Cir. 1955). During the period covered by the letter of credit, the plaintiff, Courtaulds, had dispatched several shipments of acrylic yarn to Adastra and payment had been promptly tendered by NCNB pursuant to the documentary demand made under the letter of credit. No objection had been communicated from NCNB to Courtaulds about the sufficiency of the draft or other required documents at any time, although NCNB obtained waiver each time from Adastra. Before the final shipment under the letter of credit had been made, Adastra had filed a Bankruptcy Petition, and it later told NCNB it had no authority to waive alleged discrepancies. NCNB now falls back on a technical defense of nonconformity in an effort to avoid payment

even though the purpose of the transaction was to substitute NCNB's credit for that of Adastra for the benefit of Courtaulds so that Courtaulds could protect itself against the very situation which occurred.

■ The law is clear that an issuer bank is bound by a promise in a letter of credit, which may be enforced by a person acting in strict compliance and on good faith thereof, and the bank cannot escape liability because of the insolvency of the person to whom the letter is addressed or the customer. *See generally* 6 Michie on Banks and Banking § 30 (Perm.Ed.1952). If the rule were otherwise, it would avail a person nothing to sell his goods under a letter of credit because ultimately the credit worthiness of the buyer would be necessary to assure the seller or his assignee that payment for goods would be tendered. Since the bank's obligation was to act as an insurer of the credit of the buyer, it would be inequitable to allow it to avoid the risk which it accepted in issuing the letter of credit based upon a technical defense raised after its customer had filed bankruptcy and after the previous dealings between the parties had occurred without complaint.

■ Although the Court is holding that the plaintiff's documentary demand for payment was in strict compliance with the terms of the letter of credit since the invoice and attached packing list, read together, supply the called-for description, there is another legal basis on which the plaintiff is entitled to recover. Over the entire course of dealing between the seller and the bank, the bank did not once communicate to the seller any objection to the description supplied in the invoice. The bank paid several drafts pursuant to documentary demands which supplied identical descriptions as the description contained in the dishonored invoice. Hence, the bank has waived the objections which it now seeks to offer in an effort to avoid liability.

N.C.G.S. § 25–1–205(1) defines course of dealing as "... a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct. ... (3) A course of dealing between parties ... in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement." The Official Comment following N.C.G.S. § 25–5–109, which sets forth the issuer's obligation to its customer, states that letter of credit transactions are like all agreements within the Code, in "... that [the] agreement is the bargain of the parties in fact as defined in Section 1–201(3) and includes the obligation of good faith imposed by Section 1–203 and the *observance of any course of dealing* or usage of trade made applicable by Section 1–205." (Emphasis added).

In the present case the course of dealing between the parties strongly suggests the bank regarded the description supplied in the invoice and attached packing list as being sufficient and, in any event, the bank's conduct of honoring the previous drafts without notice to the beneficiary of a deficiency lulled the beneficiary into believing the documentation was proper and complete. It would be an injustice to allow the bank to avoid liability based on an alleged technical defense it had previously waived without notice to the beneficiary.

The above rule is stated in 6 Michie on Banks and Banking, *supra*, at 373–374:

A person who is entitled to draw against a letter of credit must strictly observe the terms under which the credit is to become available, and has no cause of action against a bank refusing to honor a draft where such terms are not complied with. Courts must enforce a letter of credit as written, unless the parties have

waived their rights thereunder by subsequent action.

In Consolidated Sales Co., Inc. v. Bank of Hampton Roads, 193 Va. 307, 68 S.E. 2d 652 (1952), the defendant bank issued a letter of credit in favor of a retail electrical appliance dealer to finance sales of electrical appliances purchased from the plaintiff. The letter of credit called for drafts to be submitted accompanied by a bill of lading or invoice. The first seven payments under the letter of credit were made upon receipt of the drafts accompanied by invoices. Thereafter, the plaintiff failed to submit drafts and presented only the invoices. The defendant bank paid according to the demand of the plaintiff notwithstanding the fact that drafts were not submitted. The dispute arose over the procedure of presenting the invoices only on the last several shipments by the plaintiff, which were shipped just prior to the time the buyer was adjudged a bankrupt. The defendant declined to honor the invoice under the letter of credit.

The court was faced squarely with the question of whether the defendant, given its acceptance of invoices without drafts prior to the receipt of the invoices in dispute, could rely upon the provision of the letter of credit requiring drafts to be submitted. The court stated:

"The trial court held that continuing to make payment upon receipt of the invoices alone, the Bank had waived the provision in the letter which specified and had theretofore required that a draft accompany each invoice. With that conclusion we agree.

" 'As between the seller and the Bank, if the acts amounting to the waiver have been performed by both the buyer and the bank, the bank is obligated to pay the seller without the performance of the conditions waived. This would also hold true if the bank alone be considered to have waived the conditions.' Finkelstein: Legal Aspects of Commercial Letters of Credit, p. 209 (1930)." 68 S.E.2d at 656

Although this case was determined in a state other than North Carolina, in the absence of North Carolina case law, it is felt that the reasoning employed by this case would be followed by the North Carolina Supreme Court if it were faced with the same issue.

This Court also finds instructive an interesting Supreme Court case dating back to the 1800's. In First National Bank of Decatur, Illinois v. Home Savings Bank, 88 U.S. (21 Wall.) 294, 22 L.Ed. 560 (1875), the plaintiff sued the defendant bank because it refused to honor a draft presented to the bank pursuant to a letter of credit. The defendant bank had issued a letter of credit authorizing the plaintiff to draft its account upon shipment of cattle. The dishonored drafts were in fact drawn upon a shipment of hogs. In considering the question of whether the terminology "cattle" included hogs, Justice Davis, delivering the opinion of the court, stated that broadly construed the term "cattle" would include hogs, but that its narrow and restricted meaning would not include hogs. The court endeavored to determine what the parties intended by their use of the term "cattle" in the contract. To determine intention, the court looked to the previous dealings of the parties under the letter of credit and determined that the parties had previously dealt with cattle and hogs under the credit. On that basis the conclusion was reached that the credit embraced different kinds of stock and the term "cattle" was used in its general and broad sense by the parties. Although an ambiguity existed, the intention of the parties was clear from their past transactions under the letter of credit. The defendant was held to have waived any objections it might have been able to assert in the absence of past course of dealings.

The defendant asserts that general banking practice does not require an issuer to notify the beneficiary of a discrepancy in the documentary demand for payment if the customer waives the alleged discrepancy. To be certain, a bank need not notify the beneficiary

that a discrepancy exists if it intends to pay the draft in spite of the alleged discrepancy. However, the issuer cannot be permitted to deal with a beneficiary over an extended period of time, realizing a potential discrepancy exists and, in effect, lie in wait to ambush the beneficiary with this defense if the transaction goes sour. To allow a bank issuing a letter of credit to waive discrepancies without notice to the beneficiary and without modifying its right to strict compliance with the terms of the letter would be tantamount to offering the issuer a free way out of its contractual obligation if the bargain became unfavorable. Such a rule would not comport with a sense of justice and fair dealing in commercial transactions and would be antithetical to the underlying purposes and policies of the North Carolina Uniform Commercial Code.

In Barclays Bank D.C.O. v. Mercantile National Bank, 481 F.2d 1224 (5 Cir. 1973), the Court of Appeals for the Fifth Circuit dealt with the problem of whether the concept of waiver should be applied, in a proper factual setting, to letter of credit transactions. The court stated at 1237:

> There are no provisions in Article 5 which would indicate a belief on the part of the drafters that this doctrine of waiver should be inapplicable under the U.C.C. Absent a disavowal of the rule, a section providing to the contrary, or a section which conflicts with the purpose of this rule, § 5–102(3) provides an adequate source for the conclusion that this rule of waiver may be applied in appropriate cases. . . . Our decision that the rule should be applied to Mercantile is in accord with a court's duty to construe Article 5, as well as the other rules relating to letters of credit not codified in this Article, in such a manner as to conform the rules to an underlying sense of fair play so that the expectations of the parties to a business transaction will not be frustrated by the application of a rule

which is not grounded in sound policy considerations.

Although the Court recognizes that issuers of letters of credit need not consider other documents not required under the terms of the letter of credit (See Finding of Fact No. 47), when a document is required to accompany a draft, pages which are stapled or physically attached to that document should be considered as an integral part thereof. Additionally, when an issuer discovers a possible discrepancy, it is incumbent upon it to disclose that fact to the beneficiary as soon as reasonably possible so as to not waive the issuer's right to demand strict compliance with the terms of the credit. Since NCNB failed to adhere to either of these rules and dishonored a properly presented draft, Courtaulds' motion for summary judgment is granted.

### Conclusions of Law

1. There is no genuine issue as to a material fact existing between the parties.

2. The letter of credit is a contract and must be construed according to applicable principles of the law of contracts.

3. The draft was drawn and negotiated before August 15, 1973.

4. The documents entitled "Invoices" and "Packing Lists" which were stapled together and accompanied the draft are a part of the same communication and must be construed as one document.

5. The invoices with packing lists attached accompanying the draft are in compliance with the provisions of the letter of credit.

6. Furthermore, the defendant has waived any defense he may have had concerning nonconformity of the documentary demand by payment of several previous drafts without calling the discrepancy to the attention of the beneficiary at any time.

7. Under N.C.G.S. § 25–5–115(1), the plaintiff is entitled to recover of the de-

fendant the face amount of the draft in the amount of $67,346.71, together with interest at the rate of six percent from the date of dishonor, August 22, 1973, until paid.

A judgment will be entered accordingly.